Commonwealth *v.* Agoston, Appellant.

Argued January 3, 1950. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John Arnold Crisman,* with him *Donald A. Lewis,* for appellant.

*Hervey B. Smith.* Assistant District Attorney, with him *Warren S. Sharpless,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY:

This is an appeal from an order of the Court of Oyer and Terminer of Columbia County refusing defendant's motions for a new trial and in arrest of judgment. The defendant, Alex Agoston, Jr., aged 41 years, was convicted of murder in the first degree and the death penalty was imposed.

On December 17, 1947, defendant was taken into custody by the Pennsylvania State police for questioning in regard to the disappearance of Russell Balliet on December 9, 1947. On December 14th, Balliet's disappearance was reported to the police of Berwick by his brother. An investigation by the police revealed that Balliet had last been seen alive at about 11:30 P.M. on December 9, 1947, at which time he had left the Salem Inn with Agoston. Numerous witnesses testified that they had seen Balliet with Agoston from about 6:30 P.M. until 11:30 P.M., on December 9th.

Balliet was employed by James McElrath, who owned and operated a used car lot. On December 8th, McElrath

went out of town on a business trip leaving Balliet in charge of his business with authority to buy and sell cars. When McElrath returned from his trip on December 13th, he discovered that Balliet had withdrawn $1525 from McElrath's account at the bank, stating that he was buying a car for his employer. McElrath had agreed in the latter part of 1947 to purchase the defendant's car for $1525 but the sale was never consummated because the defendant did not have title to his car. McElrath then called on defendant to inquire whether or not Balliet had purchased his car. Defendant said that he had not sold his car to Balliet and denied any knowledge of the latter's whereabouts.

The foregoing and other circumstances caused the local and State police to suspect that the defendant could explain Balliet's disappearance. At 2:30 P. M. on December 17th, defendant was taken to the Council Room of the Berwick City Hall where he was questioned as to his whereabouts on the night of December 9th. This questioning continued for about three hours. Defendant denied any knowledge of Balliet's disappearance and also denied having been with him at any time on December 9th. Defendant was then taken to a restaurant for his evening meal. After the meal, the police drove him to his home where he picked up his car and drove it to the police station. He was again taken to the Council room where he was again interrogated until approximately 11:30 P. M., when he was placed in the detention room for the night. The next morning the officers made an examination of the defendant's automobile and they found that the front seat covers were new. These covers were removed and the police found bloodstains on the seat and a bullet hole on the back of the front seat on the side where the driver sits. It was apparent that the right windshield had been recently replaced.

At noon, on December 18th, the defendant was taken to lunch and then to the cellar of the police station where

he was shown the front seat of his automobile. The police showed him the new windshield, the bloodstains and the bullet holes in the upholstery. About 5 P. M. Agoston was brought to the Council Room, after stating that he was "willing to talk."

The defendant's bloodstained clothing, which had been found by the officers in the bedroom closet of the defendant's home, had been placed on the table of the Council Room before he was brought up from the cellar. As soon as he noticed the clothing he became "white, hysterical and started to shake violently." Doctor Buckingham was summoned to examine him and he found Agoston's pulse "regular and normal." The physician administered no drugs or medicines but told the officers to give Agoston a drink of coffee. The doctor left after ten minutes.

Shortly thereafter Agoston told the officers that his brother Floyd was responsible for Balliet's disappearance. The brother was sent for and when the two brothers confronted each other the defendant said to his brother: "Go ahead, Floydie, tell them what you did with Russell Balliet." Thereupon the brother became infuriated and had to be restrained from attacking the defendant. The brother was released between 8 and 9 P. M.

The defendant was then shown the German automatic P 38 pistol, two cartridge clips and an arm-holster which the police had found in the defendant's bedroom clothes closet. One cartridge clip was filled, containing seven loaded cartridges, the other contained only five loaded cartridges. The defendant then admitted the gun was his, stating that he had a permit from the Sheriff of Columbia County to carry the weapon for protection.

In the course of their investigation, the police discovered that the defendant had been unemployed for about three years and that he was in considerable financial difficulty. The First National Bank of Mill-

ville held a mortgage on the defendant's home in the sum of $2900 and also a note secured by his car in the sum of $1000. Both of these obligations were in default and the bank had threatened execution. He was indebted to two finance companies in the sum of $600. He owed money on a stove which he had purchased and he owed a further amount of $1500 on his car which he held under a bailment lease.

On December 10th, defendant paid arrearages on his car, amounting to $375 with two $100 bills, three $50 bills, a $20 bill and a $5 bill. These denominations corresponded with the denominations of the currency which Balliet secured from the bank on December 9th. Agoston also paid $10 to another creditor, who testified that Agoston exhibited "quite a roll" but in it there was no $10 bill. There was no bill of that denomination in the money which Balliet obtained from the bank. On this same date, Agoston bought a pair of seat covers for $13.40 and a new windshield for $10. He explained the broken windshield by saying that when he was "driving into his garage, a pole was sticking out." On December 11th, Agoston purchased an overcoat for $80 and on December 12th, he went to a Finance company and discharged an obligation of $30. On December 12th, he paid another creditor $18.04 and on December 13th, he purchased a pair of shoes for $12.80.

Between 9:30 and 10:00 P. M., December 18th, Agoston, after declaring that he would "tell the truth," gave the officers a detailed account of his movements on the night of Balliet's disappearance, stating that he had hit Balliet over the head with the gun and had shot him once in the stomach while they were parked in front of defendant's home, and had shot him once in the back of the head while parked at the northern end of the American Car and Foundry plant, at about 2:30 A. M., on December 10th. He admitted robbing Balliet of $1520. At about 4 A. M. Agoston threw the body into

the Susquehanna River from the Mifflinville Bridge. The autopsy disclosed wounds on Balliet's head and body corresponding with Agoston's account of the assault. About 9:30 A. M., December 19th, Agoston and the police went to Agoston's home, where under his guidance, the officers found two empty P38 cartridge cases and one expended P38 lead pellet in the defendant's garage. He explained that he had found these on the floor of his car as he was cleaning it on the morning of December 10th. At the defendant's home he and his parents talked with one another "in a foreign language," and then his father went down to the cellar and brought up a package of bills made up of five $100 bills, five $50 bills and a $20 bill. These were the same denominations of money which Balliet had obtained from the bank on December 9th. In the attic there was a set of seat covers for the rear seat of a 1946 Dodge Sedan. Agoston informed the police that the matching seat covers for the front seat had been burned in an incinerator.

Agoston then guided the police to the place where he had cast Balliet's body into the river. The police then took him to lunch and later to the police station. Shortly thereafter in the presence of witnesses, the District Attorney, after informing Agoston that whatever he said would be used against him and asking him if he wished counsel, interrogated him and the questions were answered freely.[1] The questions and answers

---

[1] The District Attorney said: "Now you understand further, do you, that whatever you say to me here today in the presence of these officers, Officer Stout, Officer Vandling and Officer Guers, whatever you say here to me today will be used against you at the trial or a hearing on your case? You understand that, do you?" Agoston answered: "That's right." Q. "While you are making this statement, do you want a lawyer or anybody or do you want to answer my questions?" A. "When is this gonna be?" The District Attorney: "We

were taken down stenographically and later transcribed. Agoston signed the transcript in the presence of three witnesses.

As to his treatment by the officers, Agoston stated to the District Attorney that he "had a wonderful bed and was well-fed." He said they gave him coffee and were "swell fellows." Agoston said he "confessed everything," and told them "how the murder went on." In his statement, he said: "I was intending all right to shoot him, but I had the gun out half-way and I froze on the gun. I just stopped and hesitated. I wanted to but I didn't want to, and finally we kept on talking and I pulled it out again and then I really released the safety on it. Then again I couldn't shoot. I just couldn't. Then we talked a little more again and by that time I had the gun on my lap and my coat under it, covered it, and I picked the gun up and I hit him over the head. . . . Then I gave him a shot in the chest, either chest or belly, I don't know which."

After this interrogation, the police went to the defendant's home and there found on the ground along the driveway, a pair of eyeglasses with broken lenses. The opthamologist, who prescribed for Balliet testified that the lenses corresponded with the "very unusual" prescription for glasses that he had issued for Balliet. He said: "This is the only prescription I have of this kind."

On March 18, 1948, three months and nine days after Balliet disappeared, a male body was found floating in the Susquehanna River about 80 miles below the Mifflinville Bridge. Since the winter of 1947-48 had been a cold one and the river had been frozen over, the

can't tell just exactly when the hearing will be held." Agoston: "Well by that time I will have to get settled and think about it.". Q. "At the present time, you are satisfied to make this statement to me?" A. "Yes, that's right." Q. "Without counsel?" A. "That's right."

body was in a fair state of preservation. Upon examination the doctors found bullet wounds in the head and abdomen corresponding with Agoston's statements as to the bullet wounds he had inflicted on Balliet. Balliet's brother and brother-in-law and McElrath (Balliet's employer) identified the body as that of Balliet, basing their identification upon size and build, facial features, a scar below the right knee cap and a broken front tooth in the upper plate found in the mouth. The cloth of the suit removed from the body was also identified as Russell Balliet's and perfectly matched a vest in the clothes closet used by Balliet at the home of his brother.

At the trial the Commonwealth offered in evidence, the defendant's statements to the police officers and the transcript of the questions and answers of December 19th, when the District Attorney interrogated him. The Commonwealth also offered testimony as to Agoston's financial difficulties prior to Balliet's disappearance and as to his affluence immediately afterwards when he paid several bills and made several purchases. The body of Balliet was identified as herein stated.

Agoston, in his own defense, testified that he had met Balliet about 7:00 P. M., on December 9, 1947, in the McElrath Used Car Lot in Berwick. He said: "We made a date, and we went out for the evening." They visited two restaurants and at 10 P. M. they went to the Cobblestone Inn and from there to the Salem Inn "through Berwick." He continued: "We drove on back to Berwick, and we drove down Market Street, up around the Christmas lights, and I left him off on the corner of Front and Market Streets. . . . that was the last I seen him." That was about 11 P. M. He denied that he had killed Balliet. He explained the holes in his car by saying that during the last day of the rabbit season he "was fishing and a turtle . . . was robbing my bait all the time . . . so I went to the car and I got my revolver out, and shoved the chamber, I shoved the

magazine up in the chamber and cocked the gun, and it went off." He found the bullet when he changed the seat covers. When asked why he bought new seat covers he said that the old ones were "pretty well worn" and soiled. He explained the broken windshield by intimating that boys had thrown stones at it. When asked when the windshield was broken he said: ". . . it must have been around the twelfth anyhow, eleventh or twelfth" of December. He testified that during the war he had worked for the the American Car and Foundry Company but at the end of the war he "was partly laid off," and that on "V-J" day he had $1400 in the bank and about $2000 in bonds. He procured a permit to carry a pistol "because [as he said] there was a few fellows after me at one time." He explained that after the night of December 9th, he "got a little blood on my hands when I was fixing the tire." On December 10th, he took the old seat covers off and replaced them with new ones. He burned up the old front seat covers and took the back ones to the garret. When asked about the confession he signed, he said: "It was under duress. I knew it was false. I knew Balliet was alive, very much alive." When asked if he had been threatened, he said: ". . . they threatened me. They swore at me, but I didn't pay much attention to it." He testified that Sergeant Green had said: "Goddam you. We wasted enough time with you. . . . If you ever make me mad, I will knock your goddam brains out." He claimed that Detective Jones said to him: "I will tell you, we got to have that money. We will go down there and tear your house down. They tore Hauptmann's down. We will tear yours down, too." He claimed that he answered: "There ain't much money to get down there." When asked if any other statements were made to him by any of the officers he said: "No, that is all." When he was asked if he was afraid after the statements made by Sergeant Green, he answered: "No." He was asked by his own attorney:

"Were there any inducements held out to you, or promises to make any stories now of any sort?" He answered: "Nothing whatsoever."

To rebut Agoston's testimony, as to threats the Commonwealth called Sergeant Green, who said: "They [Agoston's statements] are not true. I made no threats of any kind to this Defendant, and there were no threats of any kind made to him in my presence at any time." He said that no one swore at Agoston. Also in rebuttal, Detective Jones testified that he did not tell the accused that, "We will have to tear your house down. . . . They tore Hauptmann's house down to get that money." He said that he did not hear anyone else make those statements, or statements similar to those, to the accused.

Hurley C. Stout, who appeared as a character witness for the defendant, later testified in rebuttal for the Commonwealth, that he was present during the entire evening of December 18th, when the defendant made his admissions of guilt. The witness was asked whether any officer had made threatening statements as alleged by Agoston, he replied: "No sir." When asked about the manner in which the accused made his self-incriminating statements, Stout said: "He just talked them off like he talked any other time. He was not excited, didn't seem nervous, he just talked right along the way he talked up here on the witness stand, just told the story right along." Stout also testified that Agoston had shown himself and another officer his right hand on which there was "a black and blue mark." He said Agoston said: "This is what I got for tussling with Russell for the gun."

Harry Peterson, another one of defendant's character witnesses, was also called in rebuttal on behalf of the Commonwealth. He testified that he had talked with Agoston on December 20th. ". . . in the afternoon or evening, early evening, he [Agoston] was in the Council Room in the City Hall of Berwick. I walked

in and said, 'Well, Alex, it is time for me to go home. I want to say goodbye. I might not see you for a while.' He got up and shook hands with me. I said, 'Alex, were you treated all right while you were in custody here at the City Hall?' He said, 'I was never treated no better. . . . They gave me a good place to sleep in; they got me something to eat whenever I asked for it . . . . No one ever laid a hand one me. . . . I was treated swell, treated like a king.' "

Chiverton N. MacCrea, one of the Commonwealth's witnesses, testified that he had a lengthy conversation with Agoston on December 20th, and he heard Agoston thank Officer Peterson and say: ". . . not a soul laid a hand on me."

In his charge to the jury the trial court said: "The question of whether the oral admissions or the confessions were voluntarily made, is for you jurors to decide, and if you find the same were made as a result of threats or under stress, or otherwise improperly obtained, then you are to disregard the admissions and the confession altogether, and by the same token, if you find they were voluntarily and properly obtained, then they are entitled to be considered by you along with all of the other evidence in the case." This instruction was correct and the jury by its verdict showed that it did not believe that the confession made by Agoston was the result of threats or of any other kind of duress. Agoston's trial began on May 3, 1948 and eight days later the jury found the defendant guilty of murder in the first degree and fixed death as the penalty. The court later refused a new trial and this appeal followed.

Appellant's chief complaint is the admissibility of Agoston's confessions of guilt. There is no just ground for criticism of the interrogation of Agoston by the police officers. Karl Guers, a Private First Class in the Pennsylvania State Police, who had been assigned to this case by his superiors, testified that Agoston was

taken into custody at about 2:30 P. M., on December 17th and taken to the Berwick police station. He was questioned until 4:30 P. M. He was then taken to a restaurant for his evening meal. At about 6:00 P. M., he was taken to his home so that the police could examine his Dodge car but it was too dark to do so. The defendant drove it back to the police station so that it could be examined in the morning. The car was examined at about 10:45 A. M., on December 18th, when the stains on the front seat and the hole in the upholstery were discovered and Agoston was confronted with these discoveries. The officers then questioned Agoston on December 18th, from 2:30 P. M., until about 5:15 P. M. Guers said that Agoston was given "rest periods" during the interrogation. He was asked if he wanted an attorney and he said that he did not. He had several cups of coffee during this time. After dinner that evening, the police resumed the questioning and Agoston said that he was "willing to tell the police what happened." He then accused his brother of committing the crime. His brother was brought to the police station where he indignantly denied the accusation. The brother was released and the accused was given another rest and he then stated that he "was willing to talk."

Agoston indicated by his answers on the witness stand that he was neither "ignorant" nor "untutored" (as was the defendant in the *McNabb* case, post). He was intelligent enough to be a drill press operator during the war and to earn approximately $90 to $118 a week. He entered into a contract to buy a car and he claimed to be the owner of "four diamonds worth about $500 each." He claimed that during the war he accumulated $1400 in cash and about $2000 in war bonds. While he was told that whatever he said would be used against him and was asked if he wanted an attorney, it was really unnecessary to do this for Agoston must have known that what he had told the police officers

476

about Balliet's disappearance would be used against
him and that he was not obligated to talk. His brother
was with him before he made any confession. The Dis-
trict Attorney asked him: "Did they [police officers]
make any threats to you, try to coerce you in any way."
He said: "No." Q. "Did they threaten you in any way?"
A. "No." Q. "Did they coerce or try to force you to say
anything?" A. "They never laid a hand on me, that I
dare swear to." Q. "And they didn't threaten you with
anything?" A. "Never. No, sir. They never laid a hand
on me and they were very nice. They were A#1 princes
all the way through."

At no time in the questioning of Agoston was there
any breach of his constitutional rights. If the police
had not interrogated him, they would have been derelict
in their duty. Experienced and qualified police officers
know, as do psychologists and theologians, that when
a man possesses a guilty secret, he will, if given proper
encouragement, disclose it. When a murder has been
committed and circumstances point to the one who is
responsible for it, it is the duty of the police to *encour-
age* and not to *dis*courage that person to tell the truth.
As Chief Justice PAXSON said in *Commonwealth v.
Clark,* 130 Pa. 641, 18 A. 988: "The law is always tender
and merciful to a defendant. It will protect him
against the use of a confession drawn from him by hold-
ing out inducements to make it; but, when a criminal
wants to ease his mind by a voluntary confession, it
would be a weak sentimentalism to interfere with his
doing so."

Wigmore on Evidence, 3rd Edition, pages 318-319,
section 851, observes: ". . . an innocent person is al-
ways helped by an early opportunity to tell his whole
story; hundreds of suspected persons every day are
set free because their story thus told bears the marks
of truth. Moreover, and more important, every guilty
person is almost always ready and desirous to confess,

as soon as he is detected and arrested. This psychological truth, well known to all criminal trial judges, seems to be ignored by some Supreme Courts. The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature. It is natural, and should be lawful, to take his confession at that moment —the best one."

For a police officer to say things to a suspect which would interfere with the natural desire of a criminal, a short time after committing his crime, to "unbosom himself" is not consistent with common sense and would be prejudicial to the efficient administration of justice and would weaken the already inadequate protection which society has against criminals.

In *Commonwealth v. Dillon*, 4 Dallas 116, Chief Justice McKean speaking for this Court, said: "If such declarations are voluntarily made, all the world will agree, that they furnish the strongest evidence, of imputed guilt. . . . The true point for consideration, therefore, is, whether the prisoner has falsely declared himself guilty of a capital offence?"

In *Wilson v. State*, 19 Ga. App. 759, 92 S.E. 309, Justice (now Senator) George said: "Practically all the authorities agree that . . . the only proper question is whether the inducement held out to the prisoner tended to make his confession an untrue one. . . . The object of every legal investigation is to ascertain the truth. . . . The underlying principle is that the only confession that can be excluded is the false confession."

Brutal methods of obtaining confessions are interdicted for two reasons. (1) Inhuman treatment of

prisoners is outlawed in all civilized countries. (2) A confession obtained by methods which would induce a prisoner to confess to a crime which he did not commit in order to be relieved of treatment which has become intolerable, is worthless both in logic and in law. On the other hand when a prisoner has not been abused in any way, his admission of guilt, in reply to the interrogations of well-trained officers, should be accepted as evidence. If a man confesses to a crime *which he did not commit,* his confession, as soon as it is checked (as all confessions are), will always be found to be worthless because a lie never fits a fact. A mere naked confession, without corroboration, and which is later repudiated, is of such little probative value that it usually falls far short of proving guilt beyond a reasonable doubt.

If, for example, in the instant case, Agoston had merely stated to his interrogators: "I killed Russell Balliet," and the Commonwealth had no other evidence to present except the production of Balliet's dead body with its wounds, Agoston's conviction would have been unlikely. Not only was Agoston's confession supported by other evidence but the facts *subsequently* discovered, dovetailed with the statements made by Agoston in his confession. He confessed that he threw Balliet's body into the Susquehanna River; three months later Balliet's body was found in that river. The bullet holes found on the body corresponded with Agoston's designation of his placements of the fatal shots. The head wounds corresponded with the wounds which Agoston confessed inflicting. Agoston's lack of funds to pay his debts on December 9, 1947, and his suddenly acquired wealth on December 10th, are facts which corroborate Agoston's confession that he killed and robbed Balliet of "$1520, rolled up in a pile". How can a confession whose truthfulness was completely demonstrated be rejected as testimonially

untrue simply because the confessor was interrogated a few hours on each of two days before he confessed and who was treated so well by his interrogators that he said : "They were A#1 princes all the way through."

Eliminating those abnormal individuals who confess to crimes in order to obtain publicity, which confessions are quickly discredited by checking their details, it is difficult and perhaps impossible, to find in the annals of American court trials a single instance where a mentally and physically adult person of normal health and intelligence, who was well-treated as to food, lodging, water, air and rest, ever confessed under the mere "pressure" of interrogation, to a crime which he did not commit. Those who have had experience as lawyers or judges in the trial of either civil or criminal cases have seen witnesses undergo direct and cross-examination for several successive days without any physical or mental breakdown.

Appellant also complains because he was not given a preliminary hearing until the fourth day after his arrest. Such a delay in granting a defendant a preliminary hearing cannot properly be adjudged a denial of due process. If the delay is due to the fact that the time between the arrest and the hearing is spent in attempting by improper means to force a confession from a prisoner, the wrong done the prisoner is not the delay in giving him a hearing, but the methods used to secure a confession. A confession may be secured after a hearing as well as before a hearing. If the means employed are proper, a confession is testimonially *worthy;* if the means employed are improper a confession is testimonially *worthless.* A confession may be secured from a prisoner by unlawful methods one hour after his arrest and he may be given a hearing one hour after that, but the promptness of the hearing would not make his confession admissible. On the other hand a defend-

ant may not be given a hearing for ten days after his arrest, yet during that period he might voluntarily confess his guilt without any questions whatsoever. The delay in giving him a hearing would not make his confession inadmissible.

If due process requires the state to provide a defendant with counsel while he is being interrogated by police officers, the state should logically be required to provide a suspect with counsel from the very moment of his arrest.[2] The only function counsel could have at the time of a suspect's interrogation would be to instruct him to "keep his mouth shut." It is well-known that the "secret which the murderer possesses soon commences to possess him" and that his guilty conscience exerts a tremendous pressure on his vocal faculties. This is especially true when shortly after the crime's commission there is a letdown in the criminal's nervous energy and remorse is temporarily in the ascendant. If a criminal, desiring to release his troublesome secret, is to be frustrated by the action of the state in providing him at that time with an advocate who will counsel silence, the number of unsolved American murders will be greatly augmented, for he who plans a murderous assault does not plan to have it witnessed by anyone except the victim, and *his* lips, the felon quickly and

---

[2] Agoston was asked if he wanted counsel and he answered "No." The right guaranteed a defendant by Section 9 of the Pennsylvania Bill of Rights, " to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face," etc., does not mean that he must be provided with counsel as soon as he is taken into custody. The Act of May 31, 1718, *1 Sm. L. 105, §4, 19 P.S. 783, provides that "learned counsel" be "assigned to the prisoners" upon all trials of "capital crimes." The Act of March 22, 1907, P. L. 31, §1, provides for the appointment by the court of not more than two persons to act as counsel for a defendant when he is under indictment for murder and files an affidavit that he is destitute of means to employ counsel.

permanently seals. If "due process" requires that counsel be present when a suspect in a murder case is being interrogated, there is no logical reason why it should not require that counsel be present when a suspect in a *burglary* or *robbery* is being interrogated.

Since the record shows that Agoston was questioned by state and local police officers in a proper manner, that no physically or psychologically coercive methods were used by the officers to obtain a confession from him, the complaint of denial of due process of law in this case is without merit.

In *Lyons v. Oklahoma*, 322 U. S. 596, the defendant was indicted for murder. No counsel was supplied him until after his preliminary examination, which was subsequent to the confessions he had made. Lyons complained that the police officers physically abused and threatened him. This was denied by the officers. The interrogations, before Lyons confessed, continued until 2:30 in the morning. The Supreme Court held in an opinion by Mr. Justice REED that, "The mere questioning of a suspect while in the custody of police officers is not prohibited either as a matter of common law or due process. (Citing cases)" It was held that the defendant had not been denied due process of law and that: "The Fourteenth Amendment is a protection against criminal trials in state courts conducted in such a manner as amounts to a disregard of 'that fundamental fairness essential to the very concept of justice,' and in a way that 'necessarily prevents a fair trial.' Lizenba v. California, 314 U. S. 219, 236."

The case of *McNabb v. U. S.*, 318 U. S. 332, cited by the appellant, is distinguishable in its facts from the instant case. There the defendants who were young mountaineers, afraid of law enforcement officers, were arrested and put into a barren cell and kept there for fourteen hours, after which they were subjected to un-

remitting questioning for two days. They were un-dressed during a portion of the time and were not advised of their right to remain silent or their right to be advised by counsel. It was held that the confession had been improperly obtained.

In the case of *Ashcraft v. Tennessee*, 322 U. S. 143, Ashcraft was denied sleep or rest for 36 hours, during which time relays of officers questioned him. It was held that his confession had been improperly obtained.

In the case of *Malinski v. New York*, 324 U. S. 401, the confession was improperly obtained from the prisoner because of his apparently well-grounded fear that he was "going to get a shellacking."

In the case of *Watts v. State of Indiana*, 338 U. S. 49, the defendant was cast into solitary confinement for two days with little food and no rest. He was questioned by relays of officers for three days from 5:00 P. M. until 3:00 A. M. in the morning. It was held that his confession had been improperly obtained.

In *Turner v. Pennsylvania*, 338 U. S. 62, the majority of the Supreme Court held that the confession had been improperly obtained because the defendant had been questioned by relays of officers from four to six hours a day for five days and had not been informed of his right to remain silent and was falsely told that other suspects had "opened up" on him before he finally confessed. In the instant case the defendant was given a preliminary hearing three days after his arrest.

Agoston, while being interrogated, was in no fear of the police and he frequently praised the treatment accorded him. He was questioned by his long-time friend, Hurley Stout, a Berwick police officer, who later testified as a character witness for him. Before he confessed he was visited by his brother. Immediately after the confession he went to the home of his father and mother. After he and they talked in a "foreign

tongue," the father went to the cellar and secured the money which had been stolen from Balliet.

In judging the admissibility of confessions these facts and principles must be taken as established:

(1) The fact that the confessor is in custody and has no counsel does not invalidate a confession made by him.

(2) The fact that the interrogation of a suspect continues until he confesses is not per se a ground for invalidating his confession, nor is the fact that the interrogation lasted for a considerable period of time any ground for invalidating the confession, unless the interrogation was so long in duration as to amount to mental or physical coercion and duress.

A long interrogation is not per se fundamentally unfair. If officers of the law are to be denied the privilege of interrogating with reasonable persistence persons suspected of committing crimes and, instead of doing so, are to "close the books on the crime and forget it, with the suspect at large" (quoting from Justice JACKSON'S dissenting opinion in *Turner v. Pennsylvania*, 338 U. S. 62), the already vast number of unsolved crimes in this country will be greatly increased.

Another complaint is that the court did not instruct the jury on the defense of alibi. There was no such defense made. Since Agoston pleaded "not guilty" the Commonwealth was obliged to prove him guilty beyond a reasonable doubt, which meant that it had to prove under the theory of the case that Agoston was present when Balliet was slain. If the defense of an alibi had been set up, Agoston would have had to prove it to the satisfaction of the jury and if he failed to do so, its use as a substantive defense would have value only as tending to create a reasonable doubt of defendant's guilt. See *Commonwealth v. Mills*, 350 Pa. 478, 39 A. 2d 572.

The appellant also complains because the Commonwealth did not offer in evidence for purposes of comparison the fingerprints made while Balliet was a war worker and the fingerprints taken from the dead body. The identification of the body was so convincing that the District Attorney was justified in viewing the fingerprint evidence as merely cumulative.[3] Even if the body had not been definitely identified, the Commonwealth had offered enough evidence to prove the corpus delicti. In a homicide case, the Commonwealth is not required to produce the body of the victim. *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A. 2d 155.

Further complaint is made by the appellant "that the defendant had introduced against him evidence obtained by unlawful searches and seizures in that his automobile, his P38 pistol, his clothing and certain moneys were all taken without a search warrant and without legal authorization of any kind, and were appropriated and held and parts thereof introduced in evidence forming a substantial part of the Commonwealth's case, without which a conviction could not have been obtained." There is no merit in this contention. Without passing on the question of the legality of these seizures of evidence, "it has long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence." Wigmore on

---

[3] At the time of argument on the motions for a new trial and in arrest of judgment, counsel for the defendant filed a motion to take testimony to show that the Commonwealth had fingerprint evidence available at the time of trial. This motion was allowed. Private Schappert, of the State Police, testified that in his opinion the fingerprints "taken from the dead body were legible and capable of comparison with another fingerprint." He testified that he had made a comparison of the respective prints of the right index finger and "The comparison showed positive identification."

Evidence, 3d Ed., Vol. 8, page 5, section 2183. See also *Com. v. Connolly*, 290 Pa. 181, 138 A. 682, and *Com. v. Hunsinger*, 290 Pa. 185, 138 A. 683.

In *People v. Defore*, 242 N. Y. 13, 150 N.E. 585, the New York Court of Appeals in an opinion by Judge CARDOZO, held that a blackjack, found in defendant's room, is not incompetent evidence in the trial of the defendant for possessing it because it was procured by the trespass of an officer, though such officer might have been resisted, sued for damages or prosecuted for oppression under Penal Law, §§1846, 1847. Judge CARDOZO says: "The professed object of the trespass rather than the official character of the trespasser should test the rights of government. . . . The truth, indeed, is that the statute says nothing about consequences. It does no more than deny a privilege. Denying this, it stops. . . . The Legislature . . . has acquiesced in the ruling of this court that the prohibition of the search did not anathematize the evidence yielded through the search." See also *People v. Adams*, 176 N. Y. 351, 68 N.E. 636, and *U. S. v. Mitchell*, 322 U. S. 65.

But the chief complaint made by this appellant is, as already noted, that "the confessions here were obtained in an inherently coercive situation and are, therefore, inadmissible as a matter of law." There is, as we have demonstrated, no basis whatever for this complaint. There is nothing fundamentally unfair in the interrogation by qualified officers of persons under arrest for the commission of crimes. The fact that a person is in custody when he makes a statement certainly does not invalidate that statement. If it did, all the testimony given by the inmates of prisons would have to be rejected.[4] The detention of this appellant

---

[4] Under the Act of March 31, 1860, P. L. 427, §56, 19 P.S. 651, bail may be exacted to insure the appearance of witnesses. In default of bail, a witness may be detained in prison in order that his testimony may be available. The Act of April 19, 1933, P. L. 50, §1, 19

for twenty-six hours before he declared himself "willing to talk" does not vitiate what he said when he did "talk."

In considering the question of whether a defendant tried in a state court is denied that due process of law guaranteed him by the Fourteenth Amendment to the Federal Constitution, the United States Supreme Court in *Snyder v. Massachusetts,* 291 U. S. 97, in an opinion by Justice CARDOZO, declared that the test is whether or not the thing complained of "is so flagrantly unjust that the Constitution of the United States steps in to forbid it." Justice CARDOZO said: "Due process of law requires that the proceedings shall be fair, but fairness is a relative, not an absolute concept. It is fairness with reference to particular conditions or particular results. 'The due process clause does not impose upon the States a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall.' Ownbey v. Morgan, 256 U. S. 94. . . . The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true. The constitution and statutes and judicial decisions of the Commonwealth of Massachusetts are the authentic forms through which the sense of justice of the People of that Commonwealth expresses itself in law. We are not to supersede them on the ground that they deny the essentials of a trial because opinions may differ as to their policy or fairness. . . . There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured

---

P.S., 1949 Pocket Part, §652, provides for the compensation of persons *detained as material witnesses* by order of the court or of any district attorney or by commitment by any magistrate, alderman or justice of the peace. Their detention certainly does not vitiate their testimony.

by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free."

So likewise, "the constitution and statutes and judicial decisions" of the Commonwealth of Pennsylvania "are the authentic forms through which the sense of justice" of the People of Pennsylvania "expresses itself in law." This Court has consistently, throughout its long history, upheld the admissibility of confessions obtained under circumstances substantially similar to those under which the confession in the case at bar was obtained.[5]

The judgment is affirmed and the record is remitted to the court below so that the sentence imposed may be carried out.

PER CURIAM, April 10, 1950:

The foregoing opinion was prepared by the late Chief Justice MAXEY before his death on March 20, 1950. It is now adopted and filed as the opinion of the Court.

---

[5] See *Fife v. Com.*, 29 Pa. 429; *Com. v. Dillon*, 4 Dallas 116; *Com. v. Goodwin*, 186 Pa. 218, 40 A. 412; *Com. v. Mosler*, 4 Pa. 264; also *U. S. v. Nott*, 1 McLean 499; *Hopt v. Utah*, 110 U. S. 574.

Wigmore on Evidence (3d Ed.), Volume 3, section 865, page 352, quotes the following apposite statements by eminent English judges: Justice ERLE said in R. vs. Baldry, 2 Den. Cr. C. 445: ". . . according to my judgment, in many cases where confessions have been excluded, justice and common sense have been sacrificed, not at the shrine of mercy, but at the shrine of guilt." In 12 Cox Cr. 180 C. B. Kelly said: "The cases excluding confessions on the ground of unlawful inducement have gone too far for the protection of guilt." Justice HAYES in 15 Ir. C. L. 85, held that the exclusion of lawfully obtained confessions was "an exhibition of morbid sensibility towards criminals."