[Crim. No. 10596.   Second Dist., Div. Two.   Mar. 31, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CALVIN ANDERSON CRENSHAW, Defendant and Appellant.

Marshall K. Gordon, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David B. Stanton, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment entered following a jury trial that resulted in his conviction of the crimes of robbery (Pen. Code, § 211), and pimping (Pen. Code, § 266h).

Appellant's contention regarding the sufficiency of the evidence is without merit. Mrs. Edith Montgomery testified that she was a prostitute who had agreed to work for appellant and had done so for several months. During this period she lived with appellant and gave him all the money she earned. From these earnings he paid her living expenses. Appellant drove her to and from the locations where she practiced her profession and physically abused her if she failed to earn certain minimum amounts each night. During the time Mrs. Montgomery worked for appellant, he appeared to have no other means of support than the money she gave him.

In June 1964, Mrs. Montgomery broke off her relationship

with appellant. Thereafter, at approximately 5 :15 a.m. on August 8, 1964, appellant approached her in an alley and forced her to enter his car by pushing something into her back that she believed was a gun. After they entered the car, appellant did place a gun in the glove compartment and demanded her money. She surrendered $55 to him and subsequently notified the police.

Over appellant's objections, two officers were permitted to testify to statements made by appellant at the police station following his arrest although it was stipulated that he had not been advised of his constitutional rights in accordance with the rules enunciated in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. In each statement appellant denied robbing Mrs. Montgomery. However, one of the arresting officers was permitted to testify that during the interrogation of appellant conducted at the police station shortly after his arrest, appellant "further stated that Mrs. Montgomery was one of his whores, and that he was due this money, and that she gave it to him from the previous night's work."

This officer at first denied that this statement was made in response to questions propounded to appellant, but upon being shown his contrary testimony given at the preliminary hearing in this matter, the officer frankly conceded that he had been mistaken and that appellant's alleged admissions regarding his pimping activities had been in direct response to his questioning. Thus the officer admitted that the following testimony given by him at the preliminary hearing was correct: "Q. Do you recall anything else you asked him? A. Oh, I asked him numerous questions that I recall. I do not know the exact words I used. In substance I asked him if the victim was one of his whores. Q. Do you recall what he told you? A. He said, 'Yes.'"

Another officer, a sergeant attached to the detective division, testified that after he had read the police report prepared by the arresting officers, he interrogated appellant on the day following his arrest. He confirmed the fact that appellant denied the commission of a robbery but testified that "He further stated that he had three girls working for him, two of whom were girls on the west side of town and he had taken [Mrs. Montgomery] and picked her up off the street, put her in an apartment, bought her clothes, bought her a wig and tried to give her some class but she didn't fit with him very well and they finally broke up."

By way of defense, appellant contended that Mrs. Montgomery's testimony was fabricated by reason of her jealousy stemming from his marriage to another woman. He conceded that he knew she was working as a prostitute during his relationship with her but denied taking any money from her. He alleged that the funds which he had advanced on her behalf were gifts motivated by his compassion for her. He further admitted taking money from her on the morning of August 8, 1964, but contended that this was a voluntary repayment of Mrs. Montgomery's indebtedness to him for the purchase of a wig.

Appellant admitted having told the officers that she ''was one of [his] whores'' but went on to explain that he had meant thereby only that she was one whom he had patronized as a customer. During cross-examination appellant denied having told either of the officers who had interrogated him that he ''had some girls working for [him] out on the west side, prostitutes'' or that he had ''met Edith Montgomery on the street and [he was] going to try to give her a little class'' or that ''she didn't have it and [he wasn't] going to be able to use her with [his] other girls'' or that he ''had some girls with college educations that [he] used out on the west side.''

So far as the pimping charge is concerned, this is a classic case for the application of the law of the *Dorado* decision. Every condition precedent to its mandatory application is clearly present:

(1) Appellant had been arrested on the basis of the report to the police by the complaining witness which identified him, described the vehicle he was operating and made these criminal charges against him.

(2) *After his arrest and while he was in custody,* two different police officers interrogated appellant, first at the police station and later at the city jail.

(3) The *accusatory stage* obviously had been reached when appellant was arrested. There was no question whatever about his identity. The police were not investigating any *unsolved* crime. If *any* crime had been committed as alleged, then *appellant* was the perpetrator. He was not merely a *suspect*; he was the *accused.*

(4) The interrogations were *designed* to elicit incriminating statements. It is difficult in these circumstances to discern any other possible purpose in the repeated questioning.

(5) These interrogations *did* elicit incriminating statements, according to the testimony of the officers which was received over appellant's objections. These statements were exculpatory so far as the robbery charge was concerned, but they *admitted* every element of the crime of pimping.

(6) Realistically regarded as constituting a confession, these statements were prejudicial per se. In any event, the testimony that appellant made such statements was strongly prejudicial. Without this evidence, the jury had only to weigh appellant's testimony against that of the complaining witness.

(7) As above noted, it was stipulated that appellant was not given any advice concerning his constitutional rights and there was no waiver thereof.

From the foregoing it follows as a matter of course that the conviction on the pimping charge must be reversed.

█ In so ruling we wish to make unmistakably clear that nothing in our decision, or in the cited decisions of our higher courts, is designed to prohibit law enforcement officers from obtaining voluntarily supplied information from any person, whether he be deemed an accused or a suspect and whether such information is solicited before or after his formal arrest. As we read the decision of the United States Supreme Court in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and the decision of our Supreme Court in *People* v. *Dorado, supra,* 62 Cal.2d 338, their fundamental message is that such information, whether exculpatory or incriminatory, *should be solicited, obtained and, if relevant, subsequently received into evidence* subject only to the restriction that such information *shall not be obtained by means of an accusatory interrogation of a person conducted while he is unaware of his constitutional rights.*

█ The only limitation imposed by these decisions upon the use of self-incriminating statements is simply that *after the accusatory stage has been reached,* the accused must be informed of his rights before any further interrogation designed to elicit incriminating statements can properly be conducted to obtain admissible evidence. Unless the accused is so informed of his rights at this stage, it cannot be said that he has intelligently chosen to waive their protection.

Certainly these controlling decisions of our highest courts convey no implication that self-incrimination is something inherently evil and to be condemned under all circumstances. On the contrary, they clearly indicate that confessions and self-incriminating statements very properly may be obtained and

introduced into evidence provided only that they must *not* be obtained by methods which threaten to impair constitutionally protected rights. More recent decisions of our Supreme Court have not contradicted or impaired the validity of the following comment found in the concurring opinion of Chief Justice Traynor in *People* v. *Garner,* 57 Cal.2d 135, 163-164 [18 Cal. Rptr. 40, 367 P.2d 680] :

"As many commentators and courts have recognized, there is a 'compulsion to confess' to crime. Wigmore states the point colorfully: 'The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature.' (Wigmore on Evidence, 3d ed. § 851 at p. 319; see, e.g., *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 581, 583].) A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. 'There is . . . an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered.' (Reik, The Compulsion to Confess, p. 267.)

"So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation. (See *Culombe* v. *Connecticut,* 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037, 1040 n. 2, 1044 n. 17] ; *State* v. *Smith,* 32 NJ. 501, 534 [161 A.2d 520] ; *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 581] ; *Haley* v. *Ohio,* 332 U.S. 596, 614 [68 S.Ct. 302, 92 L.Ed. 224] [dissenting opinion].)"

However, as stated in *Escobedo* v. *Illinois, supra,* 378 U.S. at p. 490: "We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise

of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.''

On the other hand, the innocent person, who has become a suspect or an accused by reason of false accusations made by others, or by reason of strongly incriminating circumstantial evidence which has caused the suspicion of guilt to focus upon him, still retains the unimpaired right and privilege immediately to undertake to clear himself from such mistaken or misdirected suspicion by voluntarily presenting the true factual picture as he knows it. We wholly fail to perceive how the pronouncements of our higher courts regarding the need to inform an accused of his constitutional rights can possibly be interpreted as a mandate that law enforcement officers must refrain from communicating with him.

Human experience has not shown that the tongues of the innocent will be silenced by their awareness that they are not *required* to plead their innocence to the police and that, if they choose, they may have the aid of counsel in order to insure that they may not, by reason of inexperience or ineptness, give answers to ''loaded'' questions which subsequently may be reported in such a manner that they may appear to constitute evidence of their guilt.

Mrs. Montgomery, a woman with a record of arrests for prostitution, had made a complaint that she had been robbed by appellant. She had identified him, his pink Cadillac and the gun contained in its glove compartment. The officers had located appellant, the described car and the gun, thereby partially corroborating Mrs. Montgomery's report. In such a factual situation it would be correct to refer to the crime or crimes reported by Mrs. Montgomery as ''unproven,'' but neither realistically nor semantically could they be accurately described as ''unsolved.'' Appellant very clearly and definitely was ''*the* accused.''

If appellant had asserted his right to counsel and his right to remain silent after his arrival at the police station, could the officers properly have denied them? ▮ Our Supreme Court in *Dorado* has established the law that the existence of these rights is not dependent upon their assertion and that their waiver will not be presumed in the absence of evidence that the party against whom the waiver is charged was aware of their existence.

''Finally, we must recognize that the imposition of the requirement for the request would discriminate against the defendant who does not know his rights. The defendant who

does not ask for counsel is the very defendant who most needs counsel. We cannot penalize a defendant who, not understanding his constitutional rights, does not make the formal request and by such failure demonstrates his helplessness. To require the request would be to favor the defendant whose sophistication or status had fortuitously prompted him to make it." (*People* v. *Dorado, supra,* 62 Cal.2d 338, 351.)

The requirement that statements, whether incriminatory or exculpatory, be taken only from a person who has been enlightened as to his rights would appear to place no intolerable burden upon our law enforcement officers. They need engage in no esoteric legal analysis of the subtle and almost indefinable factors that may properly distinguish a mere "suspect" from an "accused." If any doubt whatsoever exists in the mind of an officer as to the proper classification to be made of the party to be examined, the officer may remove all possibility of error or blunder by the simple process of advising such person of his rights whenever such doubt exists. (See footnotes 9, 10 and 11 in *People* v. *Dorado, supra,* 62 Cal.2d at p. 355, for examples of the standards already in use by the Federal Bureau of Investigation, the military authorities and certain county law enforcement agencies.)

As we have previously noted, the giving of such advice will not infringe upon the "rights of the innocent." Neither will they remove the incentive of the police to talk to any suspect and to pursue all appropriate inquiries and investigatory procedures. (Cf. *In re Lopez,* 62 Cal.2d 368, 374 et seq. [42 Cal.Rptr. 188, 398 P.2d 380].)

Finally, we are cognizant of the rule enunciated in *Escobedo,* page 491 [378 U.S.], and stressed in *People* v. *Stewart,* 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97], that an accused must be made aware of his rights before the police undertake "a process of interrogations *that lends itself* to eliciting incriminating statements." (Italics added.) That is to say, it is not a requirement of the rule that the process of interrogation be such that it "*compels,*" "*coerces,*" "*tricks,*" *or* "*traps*" an accused into making incriminating statements. It is sufficient if it "*lends itself*" to eliciting such statements.

It seems to us that the interrogations conducted in the instant case clearly "lent" themselves and were calculated to elicit incriminating statements. They *did* produce the incriminating statements regarding the pimping charge which, as we have indicated, were of such a prejudicial nature that the conviction on this count must be reversed.

■ However, the receipt of these incriminating statements does not require a reversal of the conviction of the crime of robbery. On this subject both the testimony of the officers and that of the appellant are in complete agreement, i.e., the officers testified that appellant at all times clearly denied his guilt and appellant concedes their accuracy in this regard. Viewing the record as a whole, ''we are not of the opinion that it is reasonably probable that a result [with respect to the robbery charge] more favorable to [appellant] would have been reached had the testimony regarding [his] statements not been admitted. Such admission did not constitute reversible error under the provisions of section 4½, article VI, of the California Constitution, or under the tests enunciated in either *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243], or *Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171].'' (*People* v. *Cockrell,* 63 Cal.2d 659, 668-669 [47 Cal.Rptr. 788, 408 P.2d 116].)

Since we reverse the conviction of the crime of pimping, we do not reach the question whether or not it was prejudicial error for the court to fail to give a cautionary instruction (CALJIC 410 (rev.)) relating to the difficulty of defending against charges involving sexual offenses.

■ Finally, nothing in the record before us provides any basis for appellant's bald assertion that the trial court erred in refusing to grant him probation. Since its granting is an act of ''grace and clemency,'' it is within the broad discretion of the court to grant or deny probation and no abuse of that discretion is shown here. (*People* v. *Cortez,* 199 Cal.App.2d 839, 843-844 [19 Cal.Rptr. 50].)

The judgment as to Count 1 (robbery) is affirmed and as to Count 2 (pimping) is reversed.

Roth, P. J., concurred.

FLEMING, J., Concurring and Dissenting.—At 4:45 p.m. Officer Hollis at roll call was given the name and description of a robbery suspect who was driving a pink Cadillac convertible and might be armed with a .32 or .38 caliber 2-inch revolver. That evening at 11:55 p.m., Officer Hollis saw such a Cadillac and saw Crenshaw, who corresponded to the description of the suspect, getting into the convertible. The officer arrested Crenshaw as a robbery suspect and found a .38 caliber revolver under the right front seat. He drove him at once to the Newton Street police station, where they arrived 15 to

20 minutes after the arrest. On arrival at the station Officer Hollis asked Crenshaw if he had robbed Edith Montgomery, and Crenshaw replied he had not. Crenshaw also said the gun was not his, that Mrs. Montgomery had owed him money and had paid it back early that morning from her previous night's work. Asked if she were one of his whores, he said yes. These statements were received in evidence at his trial on charges of robbery and pimping.

Crenshaw took the stand on his own behalf and admitted the accuracy of the conversation reported by Officer Hollis. However, he testified that the conversation had been misinterpreted and that he had not been Mrs. Montgomery's pimp but merely one of her customers.

The majority reverses the conviction for pimping because it finds the conversation at the police station was improperly admitted in evidence. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) In my view the initial questioning by the arresting officer immediately following the arrest of the suspect occurred during the investigatory stage and was properly received in evidence. This case falls on all fours within the clarification of the *Dorado* rule outlined in *People* v. *Stewart,* 62 Cal.2d 571, at p. 578 [43 Cal.Rptr. 201, 400 P.2d 97], in which the court cited with approval the case of *United States* v. *Konigsberg* (3d Cir. 1964) 336 F.2d 844:

"We turn to the further requirement of *Escobedo* that, beyond the 'focus' and custody, the accusatory stage matures upon the undertaking by the police of a 'process of interrogations that lends itself to eliciting incriminating statements.' (378 U.S. at p. 491; see *id.* at pp. 485, 492; *United States* v. *Konigsberg* (3d Cir. 1964) 336 F.2d 844, 853.) Although in most cases the process of interrogations following an arrest will so lend itself, it does not necessarily do so.

"In the *Konigsberg* case, *supra,* Federal Bureau of Investigation agents apprehended the defendants in a garage containing stolen goods, arrested them and took them to the bureau's office. At that office, prior to an arraignment, the agents asked Konigsberg ' "why he was in this garage and just what had taken place . . . and . . . if he wished to cleanse himself or explain . . . what his reasons for being there were, why the other individuals were there." ' (Id at p. 852.) Konigsberg then made some incriminating statements. Among other reasons for not applying *Escobedo,* the court said that the purpose of the interrogation, even though it took place after the arrest, was not to elicit a confession. The court stated, 'The

uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. . . . If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity.' (*Id.* at p. 853; see *People* v. *Ghimenti* (1965) 232 Cal.App.2d 76, 84 [42 Cal.Rptr. 504].)

''The test which we have described does not propose a determination of the actual intent or subjective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence. Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out 'a process of interrogations that lends itself to eliciting incriminating statements' (*Escobedo* v. *Illinois, supra,* at p. 491), analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.''

I can think of no closer parallel to the *Konigsberg* case than this one. The arresting officer had little information about the reported crime except the names of the robbery suspect and the victim, the description of the automobile, and the report that the suspect had a .32 or .38 caliber revolver. After arresting the suspect on the street and immediately taking him to the nearest police station, I think the officer was duty-bound by simple questioning to give the suspect a chance to tell his side of the story. Crenshaw took advantage of this opportunity to vigorously deny all elements of robbery and to deny ownership of the revolver, but in the course of these denials he made statements which implicated him in the offense of pimping.

This case falls squarely within the situation described by Mr. Justice Frankfurter in *Culombe* v. *Connecticut,* 367 U.S. 568, 571 [81 S.Ct. 1860, 6 L.Ed.2d 1037]: ''The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the person questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death. In any event, whatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons

accused of crime cannot be made to convict themselves out of their own mouths.''

The majority appears to assume there is something inherently evil in self-incrimination. The law has never so held, for self-incrimination in the absence of compulsion, is neither undesirable nor prohibited by the Constitution. (Fifth Amendment: ''No person . . . shall be *compelled* in any criminal case to be a witness against himself. . . .'' California Constitution, art. I, § 13: ''No person shall . . . be *compelled,* in any criminal case, to be a witness against himself. . . .'') (Italics added.) (*People* v. *Cotter,* 63 Cal.2d 386, 396-397 [46 Cal.Rptr. 622, 405 P.2d 862].) Yet the decision of the majority will discourage to the point of inhibition any voluntary communication after arrest between police and suspect. In effect it instructs the police not to talk to suspects but to arrest them, book them, jail them, and let them get out if they can through use of the judicial process. Under such procedures innocent suspects may spend 4 to 48 hours in jail, presumably consoled by the thought that their affairs are being handled with due deference to the integrity of the judicial process and with a respectful obeisance to the majesty of the law. Under this decision we subject the suspect at once to the judicial process and put him immediately into the assembly line of the legal machinery of criminal prosecution for his own good. Although an innocent suspect would undoubtedly prefer to discuss matters fully with the police at the time of his first arrest in order to clear himself, in our anxiety to keep police activities under court control we discourage this and extend the legal outposts of the judicial process to all suspects under arrest. Automatically we now classify all suspects under arrest as accused, we assume that they for all practical purposes are already charged with crime, and we infer that they are guilty. In so doing we remove all incentive of the police to talk to suspects, guilty and innocent alike. Any such conversation might be deemed a constable blunder for which the suspect should go free. Needless to say under such procedures release from the machinery of the judicial process becomes a legal production of some complication, the net result of which will make life harder on the innocent and easier on the guilty.

It seems to me the majority opinion misses the point sought to be made by our higher courts, which is to discourage coercive questioning, the third degree, and compelled self-incrimination. (*In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398

P.2d 380].) I do not read *Escobedo* v. *Illinois,* 378 U.S. 478, 485 [84 S.Ct. 1758, 12 L.Ed.2d 977], and related cases as intending to outlaw voluntary communication between suspect and police at the time of first arrest or first investigation of a suspect's position. In my view the conversation with Officer Hollis at the police station was properly admissible in evidence. (*People* v. *Stewart,* 62 Cal.2d 571, 578-579 [43 Cal. Rptr. 201, 400 P.2d 97] ; *People* v. *Cotter,* 63 Cal.2d 386, 393-398 [46 Cal.Rptr. 622, 405 P.2d 862] ; *People* v. *Jacobson,* 63 Cal.2d 319, 327-328 [46 Cal.Rptr. 515, 405 P.2d 555].)

Subsequent to this first questioning, there was a second questioning of Crenshaw by Officer Dollinger of the robbery detail for approximately 30 minutes at Central Jail, how long after arrest the record does not indicate. This second interrogation took place during the accusatory stage and was improperly received in evidence. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *North,* 233 Cal.App.2d 884 [44 Cal.Rptr. 123].) However, Crenshaw's statements to Officer Dollinger merely duplicated his earlier statements to Officer Hollis, and the error of their admission was nonprejudicial. (*People* v. *Jacobson,* 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555].)

I would affirm the judgment on both counts.

Respondent's petition for a hearing by the Supreme Court was denied May 25, 1966.