## Commonwealth ex rel. Sheeler v. Burke

*James W. Tracey, Jr.*, first assistant district attorney, for Commonwealth.

*Louis B. Schwartz* and *Raymond J. Bradley*, for relator.

LEVINTHAL, J. (of C. P. No. 6 of Philadelphia County), February 15, 1951.—

*To the Honorable, the Chief Justice and Associate Justices of the Supreme Court of Pennsylvania:*

In compliance with your order of December 20, 1950, I respectfully submit the complete record of the hearing conducted on the issues of fact framed by relator's petition for a writ of habeas corpus and the answer thereto of the District Attorney of Philadelphia County, together with the following

*Findings of Fact*

1. Relator, Rudolph Sheeler, was sentenced on March 31, 1939, by the late President Judge Harry S. McDevitt to life imprisonment in the Eastern State Penitentiary on bill of indictment no. 574, March sessions, 1939, Court of Oyer and Terminer of Philadelphia County, which charged Sheeler with the murder of James T. Morrow, a police officer, who had been shot to death on November 23, 1936, in the vicinity of the Sears, Roebuck store near the Roosevelt Boulevard in Northeast Philadelphia.

2. On March 17, 1939, Sheeler was indicted not only on bill no. 574, but also on the following: No. 575, charging voluntary and involuntary manslaughter in connection with the Morrow homicide; no. 576, charging him with armed robbery of one May Baxendale on September 19, 1936; no. 578, charging him with assault and battery with intent to kill May Baxendale; no. 579, charging him with carrying a concealed deadly weapon in connection with the Baxendale robbery, and no. 577, charging him with assault and battery with intent to kill one Christian Henningson (a police officer) on May 18, 1935.

3. On March 24, 1939, Sheeler was arraigned before Judge McDevitt and pleaded guilty to the charges in all the aforementioned bills.

4. The sentence of life imprisonment on bill no. 574 followed a hearing held on March 29, 1939, before a court of three judges consisting of President Judge McDevitt, Judge Francis Shunk Brown, Jr., and Judge

James C. Crumlish, who, on March 31, 1939, adjudged Sheeler guilty of murder in the first degree and fixed the aforementioned penalty. No sentence was imposed upon bills nos. 575 to 579, inclusive.

5. After the homicide of Morrow on November 23, 1936, the police detained one Joseph Broderick for sometime during November and December of 1936. They obtained a signed statement from him on December 9, 1936, in which he confessed that he had shot the officer. No prosecution was instituted against Broderick.

6. The coroner's inquest on the Morrow death was held on December 23, 1936.

7. On May 17, 1937, one George Harland Bilger confessed that he had shot and killed Morrow. In his confession Bilger also implicated as an accessory to his murder of Morrow one Alfred Gebhardt, an officer who was on police duty with Morrow in the vicinity of the Sears, Roebuck store at the time of the homicide.

8. Bilger was indicted on bills nos. 40 and 41 of June sessions, 1937, and was tried before Judge McDevitt and a jury on June 24, 1937. Bilger did not repudiate his confession. His only defense was mental irresponsibility. The jury rendered a verdict of guilty of murder in the first degree and fixed the penalty at death. Subsequently, a new trial was granted by Judge McDevitt. Bilger thereupon pleaded guilty, and on July 1, 1938, he was sentenced by Judge McDevitt to life imprisonment in the penitentiary.

9. Gebhardt was indicted on bills nos. 42 and 43 of June sessions, 1937, as an accessory before and after the fact of murder in connection with the Morrow homicide. He was tried before Judge McDevitt and a jury on June 29, 1937. The jury rendered a verdict of not guilty.

10. Bilger was also subsequently indicted on bill no. 423 of June sessions, 1937, for the murder of one

John Canham, who was shot on September 8, 1936. He was also indicted on several other bills charging him with armed robbery (bills nos. 425 to 433). He pleaded guilty to the murder charge and was sentenced to a term of life imprisonment on this bill by Judge McDevitt. On the robbery charges, to which he pleaded not guilty, he was found guilty by the jury on all except bill no. 433 (which related to the Baxendale robbery mentioned above in finding no. 2). He was sentenced to a term of 10 to 20 years on each of the eight robbery bills, to run concurrently. After the aforementioned sentence of Sheeler on bill no. 574, Bilger was pardoned and, on the initiative of Judge McDevitt, was released from the penitentiary.

11. On May 21, 1948, Sheeler presented a petition to the Supreme Court for allowance of a new trial, nunc pro tunc, in a proceeding under the Act of April 22, 1903, P. L. 245. On October 5, 1948, the Supreme Court authorized the Court of Oyer and Terminer of Philadelphia County to grant a rule for a new trial nunc pro tunc. On April 28, 1949, argument on the motion for new trial was heard by the court consisting of President Judge McDevitt and Judges Brown and Crumlish, and on September 26, 1950 (sometime after the death of Judge McDevitt), the motion for new trial was denied.[1]

12. On April 4, 1950, relator filed his original petition with the Supreme Court for a writ of habeas corpus, on which a rule to show cause was granted, returnable May 10, 1950. The petition alleged that Sheeler was being unjustly confined and deprived of his liberty in violation of the fourteenth amendment of the Constitution of the United States and article I, sec. 9, of the Constitution of the Commonwealth of Pennsylvania. On May 9, 1950, the district attorney

---

[1] Commonwealth v. Sheeler, 73 D. & C. 570.

filed an answer to the petition in which he denied that Sheeler was deprived of any of his constitutional rights.

In addition to the foregoing uncontroverted facts of record, I find the following:

13. Despite the confession and conviction of Bilger, Judge McDevitt did not believe that he was actually guilty. He told Captain Ryan in 1938 that the police should investigate further and find the real murderer of Morrow. When the police killed Jack Howard, alias Batten, alias Stitch, a dangerous criminal on February 6, 1939, and found him armed with two revolvers on his person and more at his home, it was assumed that Howard was probably involved in the Morrow and Canham murders and the Baxendale robbery and shooting.

14. On February 16, 1939, Rudolph Sheeler was taken into custody by the police of Philadelphia, without a warrant, for the purpose of questioning him as to his connection with Howard.

15. The following are the highlights of Sheeler's background and the circumstances of his arrest:

At the time of his detention he was just 23 years old, married, living with his wife and baby in Long Island City, N. Y., and regularly employed. He came to Philadelphia on February 16, 1939, to visit his older sister, Elizabeth Morgan, who was a patient at the St. Mary's Hospital.

Sheeler had been raised in several orphanages from the time he was five until past 15. His father was insane and an inmate of Byberry; his mother was a scrubwoman employed at that institution. Shortly after his graduation from the last of the orphanages he came to live with his married sister, Elizabeth, in Philadelphia. She had deserted her husband and children and, soon after Sheeler joined her in June 1931 she became the paramour of one Jack Howard, alias

Batten, alias Stitch. Mrs. Morgan's sole support was cut off when the mother met with an accident.

Sheeler's school education while in the orphanages consisted of seven grades and one year in manual training. About six months after leaving the orphanage the mother died. After meeting Howard he received a thorough training in crime. Under the evil influence of that criminal, Sheeler participated in many violations of the law, most of them as an accomplice of Howard, ranging from petty larcenies of milk and bread to purse-snatchings from women on the highways, to armed robberies. At times he would engage in criminal activities on his own, while bumming, begging, stealing and "preying on homosexuals". Intermittently he would resume his association with Howard. All of the multitude of these crimes occurred between 1931 and May 18, 1935. It was on that day that officer Henningson was shot by Howard, some time after a purse-snatching in which Sheeler had participated.

Following Howard's shooting of Henningson, which Sheeler learned about the following day, Sheeler dissociated himself from his senior partner in crime and abandoned his criminal career. He went to New York where he found employment in a restaurant. In September 1936 he married "a respectable girl", who was "a very good influence" upon him. Mrs. Sheeler died in 1949 and was therefore not available as a witness in this proceeding.

Sheeler came from his New York home to Philadelphia on February 16, 1939, his day off from work, to visit his sister at the hospital. He had learned of Howard's death and expected that the former associates of that criminal would be sought for questioning by the police. Meanwhile, the police had been informed that Elizabeth Morgan was Howard's paramour, and they kept watch at the hospital to appre-

hend any of Mrs. Morgan's visitors. As Sheeler left the hospital he was taken into police custody.

16. At about the same time three boyhood friends of Sheeler, Ferguson, Hazlett and Ruppert, were also arrested and taken into police custody. The police held Sheeler and his friends incommunicado in City Hall and "booked" them under fictitious names.

17. Sheeler was threatened and beaten by the police officers in an effort to induce him to confess that he had participated with Howard in the commission of various crimes. They resorted not only to physical force, but also employed psychological pressure and mental torture in an effort to extract from him admissions that he had participated with Howard, particularly in the robbery and shooting of May Baxendale and in the murder of Officer Morrow. (These two crimes were apparently believed to have been committed with the same revolver. The ballistics experts never so testified in any of the numerous trials.) Soon after his arrest Sheeler admitted his former association with Howard. One detective, who questioned him continuously for seven hours, without applying any unlawful coercion or duress, failed to elicit any information connecting Sheeler with Howard after the Henningson episode of May 1935.

18. Sheeler's wife, alarmed by her husband's failure to return home, came to Philadelphia and engaged Maurice G. Weinberg and Bertram U. Weinberg, two members of the Philadelphia bar, to ascertain his whereabouts. Inquiries were made at the morgue, at hospitals and police stations and the wife inquired at the missing persons bureau of the police department. At the detective bureau they were first informed there was no "Sheeler" in custody. After several days, on February 20, 1936, Mrs. Sheeler chanced to see her husband in a City Hall corridor being taken by the detectives from one room to another, and pointed him

out to her attorneys. Though one of the attorneys identified himself as a lawyer engaged by the wife, he was not allowed to see the prisoner, the police saying that they had his client "on ice". The attorneys thereupon filed a petition for a writ of habeas corpus returnable February 24th, naming Captain of Detectives Ryan as respondent.

19. During the first week of detention Sheeler was taken by the detectives from his cellroom for questioning for a total of approximately 45 to 50 hours. On February 21st the officers had him from 9:45 a.m. to 5:10 p.m., from 6:25 p.m. to 9:45 p.m., and then from 10:15 p.m. to 1:05 a.m. of the following morning, a total of 13½ hours. On February 22nd he was out of his cell from 9:25 a.m. to 3:55 p.m., and from 6:40 p.m. to 9:10 p.m. The same evening he was taken from his cell at 9:30 p.m. and returned on February 23rd at 10 p.m. He was interrogated by numerous detectives in relays, at all hours of the day and night.

20. On February 22nd the intimidation of Sheeler reached its climax. During the many hours he was outside the cellroom that day and throughout the following night the detectives intensified their physical violence and psychological pressure. The police had threatened that if Sheeler did not confess they would also prosecute his friends, Ferguson, Hazlett and Ruppert, and promised him that they would be released if Sheeler did "coöperate" with them. The police also threatened that if he did not "coöperate" to free Bilger, "an innocent man", and clear up the marred reputation of Officer Gebhardt, he would be prosecuted for other murders and for the crimes he had admitted, as well as for the Morrow and Baxendale crimes. Sheeler did not know that because of the statute of limitations he could not have been prosecuted in 1939 for crimes committed many years earlier. He believed, as he was informed by the police, that he could be sentenced to

prison for as long as "100 years" for all the crimes of his earlier youth.

The police did not tell Sheeler the date of the Morrow murder. They informed him, and he so believed, that they had checked his employment records at the New York restaurant for November 1936 and had learned that it was on his day off from work that the Morrow murder had occurred.

The police also informed Sheeler that a witness had been located who could identify him as one who had hitch-hiked an automobile ride on the road from Philadelphia to New York on the night of the Morrow murder, who had a revolver in his pocket at the time, and who actually disclosed to the motorist that he had shot an officer earlier that evening. At about three o'clock in the morning of February 23rd, Sheeler, who had been put in a "line-up" with two nonprisoners, was "identified" by one Hugh Quinn as the person seen by him on the night of the Morrow homicide under the aforementioned circumstances.

21. The police informed Sheeler, and he so believed, that if he persisted in asserting his innocence of the Morrow murder and in denying Quinn's statement, he would be tried and convicted and, in view of his many admitted prior crimes, would be severely punished and never pardoned. He was informed by the police, and so believed, that if he "coöperated" and confessed and pleaded guilty to the Baxendale and Morrow crimes he would not be sentenced to death but, with the assistance of the police and the sentencing judge, would be pardoned and released from custody after a relatively short term of imprisonment.

22. Believing that his position was hopeless unless he yielded to the threats and promises of the police, Sheeler orally "confessed" on February 23, 1939, that he was with Howard when the Baxendale and Morrow crimes were committed. At 10:50 a.m. that day he

signed a statement in which he "described" the commission of these crimes. The rather vague narrative was a combination of details he remembered hearing from the police and Quinn during the questioning and confrontation, of other details his past experiences in crime supplied, and of still others he imagined would lend plausibility to his story. After his "confession" was obtained the police sought to improve Sheeler's appearance and dress and tried to remove any noticeable evidence of violence, so that Sheeler might publicly "reënact" the crimes that day. (After the "reenactment" Sheeler "corrected" his "confession" as to the locale of the Baxendale crime.)

23. At the habeas corpus hearing on February 24, 1939, attorney Weinberg represented Sheeler in accordance with his express wish. The following strange colloquy is revealed by the record:

"Unidentified speaker, (obviously one of the detectives) : 'The man says he does not want a lawyer.'

"Mr. Weinberg: 'Do you want a lawyer or not?'

"The defendant: 'Yes, I do.' "

At this hearing Detective Richardson testified that the investigation of the cases against Sheeler had been completed the preceding day, and that the police were ready to give petitioner a hearing before the magistrate forthwith. Because of these representations by the police the court dismissed the petition for the writ, after Richardson had assured the court there would be "no obstacle in the way" of counsel.

24. At the magistrate's hearing which followed immediately, Sheeler was also represented by attorney Weinberg, who was denounced by Captain Richardson as "a man (who) don't understand criminal law, goes out snatching prisoners . . . keeps trying to interfere with us . . ." Detective Richardson testified that Officer Atkins had described Sheeler to a "T" as the person he saw at the scene of the Morrow crime, where-

as the record shows that the person referred to was one Pomroy, an employe at the Sears store, not at all involved in the homicide. At this hearing Sheeler was asked by his attorney: "Did you volunteer anything to the officers? Just answer 'yes' or 'no'." Defendant answered: "No." Sheeler was then held without bail for a further hearing on March 3, 1939, because of the representation by Detective Richardson that further time was required for investigation.

25. Despite the efforts of attorney Weinberg to have Sheeler released from the exclusive control of the police, he was returned to their custody and continued to be held in City Hall. At no time during his detention was he in the county prison, and he did not enter the penitentiary until April 1st. His detention at the City Hall for 42 days was "permitted" by Judge McDevitt at the request of Detective Richardson.

26. Observing the futility of his attorney's efforts on his behalf, Sheeler further yielded to the duress and psychological pressure of the police, and on February 24th signed a statement in which he repudiated his earlier public recantation of his "confession" and blamed the "influence of Attorney Weinberg" for his assertion that the "confession" was involuntary.

27. Thereafter the police treated Sheeler with apparent kindness, permitting him to see his wife and child occasionally and taking him out for meals and auto rides. Father Farley, on a casual visit to the cell-room, observed that "they were in accord, one with the other, the police and the boy in custody. It seemed to be some sort of an amicable settlement . . ."

28. Sheeler did not thereafter have the advice of Attorney Weinberg or any other lawyer of his or his family's choice. At the continued magistrate's hearing on March 3rd the magistrate, addressing Sheeler, asked him whether anyone represented him and he

replied in the negative. The record of that hearing contains the following:

"Attorney stepped up and told the defendant that he represented his sister and that the defendant's sister had requested him to represent the defendant."

Sheeler said: "I don't care to have anyone represent me." The hearing was continued to March 7th, at which time he was held without bail for court.

29. On March 24, 1939, Sheeler was arraigned on the various bills of indictment, including the murder bill no. 574, before Judge McDevitt and pleaded guilty. It is conceded of record that Sheeler was not represented by counsel at the time of his arraignment and pleas. Nor was he advised by anyone as to the effect of his pleas of guilty. (It should be noted that only one cell-room withdrawal pass was issued for Rudolph Sheeler on March 24th. That pass indicates he was taken out by a detective at 7:05 p.m. and returned at 8:05 p.m. This substantiates Sheeler's strange but uncontradicted testimony that he was arraigned and entered his pleas in an "empty courtroom".)

30. On March 24, 1939, Sheeler signed and swore to an "affidavit of destitute circumstances and request to assign counsel", and Judge McDevitt assigned Edmund G. J. Dale, Esq., and Robert C. Duffy, Esq., to defend Sheeler. These counsel were notified of their appointment at about noon of March 28th, the day before the case was listed for trial. They interviewed Sheeler in the detective headquarters, in the absence of the police, for several hours beginning at 6 o'clock that evening. The court-assigned attorneys, able and honorable members of the bar, mistakenly believed that Sheeler's "confession" and plea were voluntary, as they were told by Sheeler himself. They therefore did not consider it necessary or desirable to ask for a continuance of the trial or to examine the "confession" or the notes of testimony at the coroner's inquest, or at

the Bilger and Gebhardt trials. They prepared merely to have Sheeler "testify in a way which would be interesting to advance a sympathetic side to his story".

31. The following morning, on March 29th, at the hearing before the court en banc, the "confession" of February 23rd was offered in evidence and attached to the record. Sheeler also testified in support of his "confession". Several discrepancies were disclosed, one of which Judge Brown inquired about. The police kept Sheeler in their custody after the hearing and on March 31st a final "confession" was obtained from him in which the discrepancies uncovered by Judge Brown's questioning were eliminated.

32. Sheeler's account of the Baxendale and Morrow crimes, both in his "confession" and in his self-incriminating testimony, was palpably false and inconsistent with facts known or available to the police. The police explicitly informed the court en banc that the "confession" had been checked and found to be true. If the "confession" had actually been checked with reasonable care and intelligence, the following inherent contradictions would have been revealed:

(a) The confession described the Baxendale robbery and shooting as having occurred the same evening as the Morrow murder and shortly preceding it. In the statement Sheeler said that he and Howard went to the site of the Morrow crime because the Baxendale crime netted them only about $10. Actually more than two months intervened between the two crimes.

(b) Sheeler testified that he and Howard went to the vicinity of the Sears, Roebuck plant to rob shoppers of the store. The Morrow shooting occurred at about 6:30 p.m. The store had closed at 5 p.m. on that day.

(c) Sheeler's "confession" and his testimony indicate that Howard shot Morrow in the stomach, face to face. The coroner's physician, who was not produced

at Sheeler's trial, had on three prior occasions described Morrow's gunshot wounds in detail, indicating that he was shot from behind and the side, not in front. A fair summary of that testimony was given by Judge McDevitt himself in his amazing magazine article entitled "DEATH'S STAND-IN—Philadelphia's Riddle of the Reversed Clues" (True Detective Mysteries, December 1939, p. 56 at p. 117).

(d) The "confession" places the Morrow murder at a point adjacent to the parking lot, whereas the actual scene of the crime was several hundred feet distant.

(e) The "confession" mentioned two street and house addresses which the police knew, or should have known, to be false: (1) Quinn's residence was actually on Seventeenth Street, West New York, N. J. Sheeler mistakenly assumed that Quinn had given his address as Fourteenth Street, New York City, and recounted his visit to Quinn's "home" in New York City; (2) Sheeler gave an address on North Phillips Street as the home of one Grekowski with whom Howard lived in November 1936 and as the place from which Howard emerged to join him on the day of the Baxendale and Morrow crimes. Although Howard had stayed at Grekowski's house on Orkney Street for 10 days in the middle of 1936, the uncontradicted testimony in this case establishes that the house Sheeler referred to was where Grekowski had resided from 1932 to 1934, and that this house was torn down two years prior to the Morrow murder.

(f) In the "confession" it was stated that Howard's revolver was taken from an officer robbed by Howard in Brooklyn in 1934 or 1935. During the course of the hearing before me, this statement was checked by the police of New York City, at the insistence of counsel for petitioner, and found to be unsubstantiated.

(g) Most important is the fact that if the police had properly checked with the known employer of Shee-

ler (as they told both him and the court en banc they had done) they would have learned that he could not possibly have been in Philadelphia when the Baxendale and Morrow crimes were committed. The manager of the White Castle Restaurants clearly explained the employment records of his company which were offered in evidence. It is definitely established that Sheeler worked in the Upper Bronx, New York, on September 19, 1936 (the date of the Baxendale robbery) for 10 hours from 7 a.m. to 5 p.m., and on November 23, 1936 (the date of the Morrow murder) also for 10 hours, beginning no earlier than 5 p.m. and no later than 8 p.m. It would have been physically impossible for Sheeler to have been at the Sears, Roebuck plant at 6:30 p.m., to have fled on foot several miles, taken a trolley car to Fifth Street and Roosevelt Boulevard, hitch-hiked to Rahway by truck, then to New York City by auto, and then gone by subway to the Upper Bronx (as his "confession" narrates), and still arrive at his place of employment no later than 8 p.m. that evening. (Nor is it reasonable to suggest that he went to work long after his shift began and, in order to fabricate an alibi, registered as though he worked the full 10 hours. If he had done so, he would have refused to accept the conflicting stories of the detectives that the employer had no record of his employment and that the crimes were committed on his day off from work.)

33. The police testified at the Sheeler trial that Sheeler had been identified by "a respectable citizen of Syracuse . . . whose name we are not disclosing" as a young man who was picked up by the "witness" while Sheeler was in flight after the Morrow murder. The police knew, or should have known, that this unidentified "respectable citizen" was one Hugh Quinn, alias Mitchell, a disreputable criminal who had been convicted of many grave offenses and who, when not in prison, was a professional police informer. The

police also knew, or should have known, that Quinn had given a statement to the New York police in November 1936 which was inconsistent in essential details with Sheeler's "confession" and testimony, and that his description of the hitch-hiker could not have applied to Sheeler.

34. The police had so systematically demoralized and terrorized Sheeler that he became their eager collaborator in establishing his "guilt" of the Baxendale and Morrow crimes, of which he was actually innocent. His "confession", his guilty pleas, and his testimony on March 29, 1939, with respect to the Baxendale and Morrow crimes, were in fact false and fabricated, and the direct result of the coercion and psychological pressure of the police. (Sheeler's recent admission of guilt as to the Henningson shooting in his petition for writ of habeas corpus should be construed as merely the opinion of a layman. It is shown that Sheeler's participation was such that it is doubtful whether he was in fact guilty of any crime in connection with that shooting.)

### Discussion

The fundamental issue in this case is not whether petitioner was guilty of the murder of Morrow, although the fact that he was actually innocent of that crime lends credence to his complaint that his "confession" and guilty pleas were involuntary. Nor is the issue whether he is entitled to a pardon. His innocence of the murder for which he was sentenced, his pathetic background and his remarkable self-improvement (encouraged by the humanitarian friendship of such men as Dr. George Dobbin Brown and Dr. Lawrence C. Lockley) naturally arouse our sympathy, despite the many crimes Sheeler admittedly committed for which he was never punished; but we are not concerned with the question of clemency. The sole inquiry here is whether Sheeler was denied his constitu-

tional rights. If so, he is entitled to relief as an act of justice, not of mercy.

It is well established that the writ of habeas corpus cannot be used as a substitute for an appeal to review judicial errors or to test the correctness of a conviction. Where, however, the constitutional rights of a defendant in a criminal proceeding have been so abused as to offend those principles of law and those canons of decency which constitute the concept of due process, our courts have never surrendered to the executive department of the government the power and duty, in appropriate cases, of acting effectively to vindicate fundamental justice. As was said by the United States Supreme Court in Ex Parte Lange, 18 Wall. 163, at p. 178, and quoted with approval by the late Chief Justice Maxey in Commonwealth v. Johnson, 348 Pa. 349, 353 (1944):

"There is no more sacred duty of a court than . . . to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman . . ."

Rudolph Sheeler's story in some of its aspects is extraordinary, even fantastic. Innocent men do not normally admit guilt, and if through duress they should falsely incriminate themselves, they naturally seek the earliest opportunity to repudiate their "confession". It is, therefore, not surprising that President Judge Brown, in his opinion (in which Judge Crumlish concurred) discharging the rule for a new trial nunc pro tunc, concluded that "there appears to be no ground for substantial doubt as to defendant's guilt". It should, however, be noted that this was said upon consideration only of briefs of argument and a few fragmentary affidavits, and not after full hearing in open court.

The skepticism I personally entertained on first reading the petition of Rudolph Sheeler was completely

dispelled after hearing the witnesses who appeared before me. The mass of clear, precise and indubitable evidence marshaled in his behalf was most impressive. The testimony of Father Farley is especially noteworthy. The Catholic chaplain corroborated Sheeler's account of having confided to him his secret innocence immediately after his arrival in the penitentiary in April 1939. The letter of May 6, 1945, in which the youthful convict bares his soul to the priest, is also revealing. It demonstrates that Sheeler had for years continued to rely on Judge McDevitt's and Father Farley's expected assistance in obtaining a pardon *"even if (he) were guilty"*. Such consonant statements as these are, of course, not substantive evidence of the truth of the facts stated, but they rebut the suggestion that the story of Sheeler is of recent fabrication. His letter to the priest also shows that Sheeler realized that if he divulged the truth concerning his "confession", "violent explosions" would be set off, and that in his bewilderment and confusion Sheeler had decided to remain silent unless the situation became "desperate". The letter of Judge McDevitt dated September 16, 1946, which stated that the judge did not "seem to have much influence with the present Board of Pardons", but that he would "be glad to give (Sheeler) a good recommendation . . ." is of some significance in explaining why Sheeler finally revealed the truth to Mr. Dale and moved for a new trial through Mr. Maris. It should be noted that Judge McDevitt's letter was written after Father Farley had given him the photostatic copies of Sheeler's employment records establishing what the chaplain described as a "perfect alibi".

An analysis of the findings of fact will disclose that nearly all of them are supported by uncontradicted evidence. The only serious conflict in the testimony relates to the alleged physical beatings and mental

torture. The police would have us believe that their prisoner was eager to "coöperate" in solving the Morrow and Baxendale crimes, and that his confession was not only voluntary but freely volunteered. They protest that they treated him with the utmost consideration. It is true that Sheeler testified before the court en banc that he had not been beaten or threatened by the police, but it is difficult to accept at face value Sheeler's excessive laudations of his jailors as "the finest men" he ever met, who treated him "wonderful", and who "didn't care whether (he) was guilty or innocent" . . . who "didn't touch (him) or anything". It is clear to me that this overlavish praise reflected the mental and emotional state of Sheeler while on the witness stand before the three judges. He had made his "settlement" with the police. They were doing what they had promised. He was eager to "coöperate" with them. Indeed, when Judge Brown asked him some penetrating questions which indicated that serious discrepancies in his "confession" and testimony might be uncovered, he became "excited" as if panic-stricken lest he betray his innocence.

As a witness before me Sheeler was at first quite nervous and tense. He soon became calm and self-possessed. He impressed me with his sincerity and candor, his truthfulness and accuracy. He was corroborated, wherever possible, by disinterested and reliable witnesses, such as the manager of the restaurant corporation by whom he had been employed in the fall of 1936; by the Catholic chaplain, Father Farley; by Detective David Malone, whose bedside examination is especially revealing as to police methods of "interrogating" suspects; by the two reputable attorneys whom his wife had engaged; by the newspaper photographer who took the pictures at the magistrate's hearing which show marks on the face of Sheeler; by the record of the hearing in which explicit

reference is made to the marks; by Ferguson and Hazlett, who, though boyhood friends of Sheeler, were straightforward and trustworthy witnesses, and by Grekowski, whose uncontradicted testimony as to the North Phillips Street house indicates the inaccuracy of one detail in the "confession". Sheeler was also substantiated by the official record of the New York Surrogate Court which indicates the falsity of his explanation for being in Philadelphia when the Baxendale crime occurred. Most revealing are the cellroom withdrawal passes, which petitioner and his counsel examined for the first time when they were produced by the police department at the hearing before me after Sheeler left the stand.

On the other hand, the testimony of the detectives who contradicted Sheeler's account of their brutal treatment and intimidation was evasive and disingenuous. Their explanations for the evident bruises on Sheeler's face were contradictory and absurd. One told a story of a "suicide attempt" and another suggested that "pimples" might have disfigured his forehead and cheek. Captain Richardson, when questioned at the magistrate's hearing on February 24, 1939, testified that he could not explain the marks on Sheeler's face, and when asked directly whether Sheeler had been beaten or assaulted, answered: "Not in my presence." The police officers who denied the use of force in extracting the "confession" were discredited on cross-examination, in the course of which the detectives contradicted official records of the police department, their own testimony in prior proceedings, or the testimony of fellow detectives.

The testimony of Judge Carroll (the assistant district attorney at the Bilger, Gebhardt and Sheeler trials of 1937 to 1939) and of Attorneys Dale and Duffy (the court-appointed counsel) did not contradict

any of the essential details of Sheeler's version of what had occurred.

After careful study of the entire record, I respectfully suggest that the petition for a writ of habeas corpus should be granted, and the sentence of life imprisonment on bill no. 574 and the pleas of guilty on all bills, nos. 574 to 579, be set aside. This recommendation is based upon the following

### Conclusion of Law

*Under the extraordinary circumstances of this case,* to wit, (1) the use by the police of physical force and psychological pressure in extracting a "confession" and plea of guilty from defendant; (2) the willful or reckless suppression and falsification at the trial of material facts known or available to the police; (3) the successful interference of the police with the lawyer engaged by the prisoner's wife, rendering ineffectual his efforts to safeguard the prisoner's rights; (4) the acceptance by the court of a plea of guilty from an uncounselled defendant charged with murder; and (5) the belated appointment by the court of counsel immediately preceding the trial, and after arraignment and plea; *the sentence of life imprisonment constitutes a deprivation of liberty in violation of the fourteenth amendment of the Constitution of the United States and of article I, sec. 9, of the Constitution of Pennsylvania.*

This is not the case of a "confession" extracted from a defendant merely by prolonged questioning, by "the suction process of interrogation", concerning the effect of which reasonable men may and do reasonably disagree. (See the majority and minority opinions in Haley v. Ohio, 332 U. S. 596 (1948) ; Watts v. Indiana, 338 U. S. 49 (1949) ; Turner v. Pennsylvania, 338 U. S. 62 (1949).) Here we have a "confession" wrung from a suspect by brutality, deception, intimidation, and foul play on the part of the police. So grave an abuse of

the power of arrest and detention must be vigorously condemned by all who cherish our basic constitutional liberties.

It is argued that the manner in which the "confession" was originally extorted is of no moment, from the constitutional point of view, because Sheeler pleaded guilty and testified before the court en banc in support of his "confession". This contention is, in my opinion, unsound as applied to the facts of this case.

The late Chief Justice Maxey (in Commonwealth v. Agoston, 364 Pa. 464, 478 (1950)) observed:

"If a man confesses to a crime *which he did not commit*, his confession, as soon as it is checked (as all confessions are), will always be found to be worthless because a lie never fits a fact."

Largely because of this logical assumption that the police, acting in good faith and with reasonable intelligence, *always* check a confession, our courts generally regard a guilty plea on arraignment, following an extra-judicial confession, as equivalent to a conviction of the highest order, one not normally subject to collateral attack. Our statute provides that if a person indicted for murder "is convicted by *confession*, the court shall proceed, *by examination of witnesses*, to determine the degree of the crime, and to give sentence accordingly": Act of June 24, 1939, P. L. 872, sec. 701, 18 PS §4701. (Italics supplied.) It may be conceded that this provision does not require formal proof of all the elements of the crime charged against defendant, but it does presuppose that the court and the district attorney will not be misled by the willful or reckless suppression or falsification of material facts known or available to the police.

One of the detectives was asked by the assistant district attorney: "Everything he (Sheeler) said, you were able to check on?" The witness categorically replied: "That is right". He also testified specifically that

"every restaurant was investigated", mentioning the White Castle System among others, and stated that he found that Sheeler was working *since November 1936*. (Actually Manager Shackleford testified that Sheeler was regularly employed since *before* the Baxendale robbery in September 1936). As already indicated, and as established by the testimony of the manager of the restaurant corporation, this could only have been a willful or stupid falsification of extremely important matters before the court. The detectives also suppressed or distorted the truth when they characterized Quinn as "a respectable citizen of Syracuse"; when they failed to tell the court that Quinn's original 1936 description, as disclosed in the report of Lieutenant Greenhalgh was inconsistent with his 1939 identification of Sheeler and with statements contained in defendant's "confession"; and when they made no mention of the description of Morrow's gunshot wounds as disclosed by the coroner's physician.

It is not suggested that the misconduct of the police was necessarily intended deliberately to convict of murder a man known by them to be innocent. An examination of the Sheeler trial transcript indicates that the law enforcement officers, in seeking to establish the guilt of Sheeler, the known associate and accomplice of Howard, were particularly anxious to free Bilger and to clear the reputation of their fellow-officer Gebhardt. The impression created from a reading of the record of the Sheeler trial is that the entire proceeding was in the nature of a vicarious prosecution of Howard, the dead desperado, for the purpose of exculpating Bilger, the living convict. (Note Judge Carroll's comment from the witness-stand, in the hearing before me, that the conflict of opinion between the then Mayor of Philadelphia and Judge McDevitt as to who actually killed Morrow "caused a very serious and severe rupture and therefore a beclouding of thinking in the men that

had the responsibility for determining who was the right person".)

The police were reckless, if not malicious, in their handling of the Sheeler case from February 16th until March 31st. In Townsend v. Pennsylvania, 334 U. S. 736 (1948) and Com. v. Townsend, 361 Pa. 35 (1949), it was "carelessness or foul play" of a much less flagrant variety and degree than manifested in this case that evoked judicial condemnation and resulted in the setting aside of the plea and sentence. When the police willfully or recklessly suppress or falsify evidence as to material facts within their reach, and thus mislead the court and counsel for the Commonwealth and for defendant, the court en banc has not been permitted, as the statute commands, to proceed *"by examination of witnesses* to determine the degree of the crime and to give sentence accordingly". Instead, the court's judgment and sentence have been unwittingly determined by police distortion and suppression of facts which if accurately presented would undoubtedly have led the court to direct the withdrawal of the pleas of guilty and the substitution of not guilty pleas.

Moreover, the evidence establishes that the pleas of guilty were themselves the direct result of the coercion and deception on the part of the police which had earlier induced Sheeler's "confession". The pleas under such circumstances were involuntary, and hence not immune to collateral attack.

There is another aspect of the case as to which there is little conflict in the testimony and which may be regarded as establishing that Sheeler was denied a basic constitutional right. Every person accused of murder has the unquestioned "right to be heard by himself *and his counsel*". There is no doubt that the active interference by the police with Attorney Weinberg's representation of Sheeler, their refusal to permit free consultation between their prisoner and the

lawyer engaged by his wife, and their frustration of counsel's efforts to assist him, amounted to a flagrant violation of his right to be heard by counsel of his choice. Our Federal and State Constitutions ordain that if a defendant in a capital case provides himself with counsel, the court shall allow the lawyer to assist and represent his client. What the court is directed to permit, the police are not empowered to prevent.

At the habeas corpus hearing of February 24th, despite the efforts of the police to oust the attorney selected by his wife, Sheeler had the momentary courage to defy the detectives and to tell the court that he wanted a lawyer. It cannot be seriously contended that the express refusal by Sheeler of the services of a lawyer retained by his sister at the magistrate's hearing of March 3rd was a free and voluntary waiver of his right to have counsel of his own choice. Rather is it a clear manifestation of the control improperly exerted over him by the police. In the interval between February 24th and March 3rd, the detectives had succeeded in inducing their helpless prisoner to reaffirm his repudiated "confession", to adhere to it, and to reject as futile the proffered services of counsel.

Neither can it be argued that the formal gesture of appointing court-assigned attorneys for Sheeler, after his arraignment on a charge of murder, after his plea, and immediately before trial, cured the constitutional infirmity produced by the police when they interfered with Sheeler's right to consult with counsel of his own free choice. The words of Mr. Justice Jones in Com. ex rel. Townsend v. Burke, 361 Pa. 35, at pp. 40 and 41 (1949), are peculiarly applicable:

"Once the lack of counsel became a denial of due process in the circumstances, the particular constitutional deficiency could not be lopped off and allocated to but one portion of the proceedings. Like a blood stream infection, which permeates the whole body, the

harmful condition cannot be isolated to what appears to have been the incipient focal point of infection."

There can be no doubt that the appointment of counsel by the court was belated and therefore ineffectual. Mr. Justice Horace Stern, in Com. v. Johnson, 365 Pa. 303, at p. 316 (1950), pointed out that under the decisions of the Supreme Court of the United States "counsel must be assigned for the defense of the accused in capital cases after indictment, or at least at the time of arraignment". This is but a succinct reaffirmation of what Mr. Justice Sutherland declared in Powell v. Alabama, 287 U. S. 45, at pp. 57 and 58 (1932): ". . . during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself . . . It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thoroughgoing investigation might disclose as to the facts. No attempt was made to investigate."

The case of Canizio v. New York, 327 U. S. 82 (1946), where subsequent participation of counsel was held to cure the defect caused by accepting a plea from an uncounselled defendant, is distinguishable, first, because that was not a capital case, and, secondly, because defendant there had not suffered any real detriment by reason of the absence of counsel at his arraignment. Sheeler was decidedly prejudiced by the failure of the court to assign counsel prior to the time of his arraignment. Instead of merely a single inter-

view of a few hours with their client in the detective headquarters at City Hall, the appointed attorneys would have had an opportunity for extended consultations with defendant and for careful study of the "confession" and of the relevant records relating to the Morrow homicide. The acquiescence of able counsel in Sheeler's apparent eagerness to stand trial immediately on his plea of guilty is understandable only in view of the short time available for consultation and study. As previously indicated, it would have been a relatively easy matter for intelligent lawyers to check the "confession" and to establish its inherent falsity.

Moreover, since all the charges against Sheeler were based on the assumption that he was acting as an accomplice of Howard, the law of criminal conspiracy with its technicalities and intricacies would have been considered by his attorneys, had their assignment not been so long delayed. As competent lawyers, they would have realized that even if the "confession" were assumed to be voluntary and true (although actually coerced and false), there were grave questions of law as to whether Sheeler could properly be adjudged guilty of the Morrow murder (bill no. 574) or of the Henningson shooting (bill no. 577). As to the former charge, counsel might successfully have contended that Sheeler was not engaged in the perpetration or attempt to perpetrate a robbery at the time of the alleged shooting of the officer by Howard. Even if the two men had been wishfully waiting at 6:30 p.m. to rob a customer of the store which had closed at 5 p.m., without any potential victim in sight, it is questionable whether Sheeler, as a matter of law, could be held responsible for the sudden shooting by Howard of the approaching policeman. As for the Henningson case, it might reasonably have been urged by counsel that according to the "confession" Sheeler was not criminally implicated in How-

ard's shooting of that officer in May of 1935. The assault took place while Howard was resisting arrest, at some considerable time after the purse-snatching by the two men had been completed, and not while the men were in flight from the scene of their earlier joint crime. Thus, counsel might well have convinced the court, if their appointment had afforded them an opportunity for adequate preparation of their client's defense, that the "confessed" conspiracy to commit a robbery had not yet begun to operate at the time of the shooting of Morrow, and that the conspiracy to rob had been fully completed when Henningson was shot.

In two recent cases the Supreme Court of the United States has had occasion to indicate how vital it is for a person accused of a capital crime to have effective aid of counsel *before* as well as *at* his trial.

"Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered": Von Moltke v. Gillies, 332 U. S. 708, 721 (1948).

"He (the accused) needs the aid of counsel lest he be the victim of overzealous prosecutors, of the law's complexity, or of his own ignorance or bewilderment": Williams v. Kaiser, 323 U. S. 471, 476 (1945).

Our own Supreme Court, in Com. v. O'Keefe, 298 Pa. 169, at p. 173 (1929), pronounced the same doctrine, and not in a capital case, when it declared:

"It is vain to give the accused a day in court, with no opportunity to prepare for it, or to guarantee him counsel without giving the latter any opportunity to acquaint himself with the facts or law of the case."

Recognizing the danger of releasing prisoners by accepting their contradicted testimony concerning police misconduct, even when supported by other evidence, emphasis has been placed in this discussion

upon the uncontroverted and incontrovertible facts. It should be noted, however, that the uncontradicted facts lend credit to petitioner's charges of coercion and deception by the police.

Upon consideration of the entire record I unhesitatingly conclude that petitioner has sustained the heavy burden which the law imposes upon him of proving that he is entitled to the extraordinary remedy afforded by the writ of habeas corpus. The unusual circumstances of this case in their totality clearly establish that Rudolph Sheeler has for the past 12 years been deprived of his liberty without due process of law. It is accordingly recommended that the sentence on bill no. 574 be vacated, and the pleas on all the bills, nos. 574 to 579, inclusive, be set aside.