[Crim. No. 7335. Second Dist., Div. One. Feb. 5, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FIDEL G. CORTEZ, Defendant and Appellant.

David C. Marcus for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from an order denying defendant's motion to quash a warrant of arrest for violation of probation and motion in arrest of judgment, and from an order and judgment made by the superior court on May 27, 1960.

On or about February 2, 1955, the appellant, with Dolores Cortez, was indicted in Los Angeles County for the crime of possessing heroin in violation of section 11500 of the Health and Safety Code. After other proceedings were had the appellant was found guilty as charged on June 7, 1955. The matter on that date was referred to the probation officer for investigation and report. On June 23, 1955, a probation officer's report was filed wherein it was set forth, among other things, that appellant was born in Mexico, that he came to this country in 1945, and that in 1950 he was married. His arrest

record, according to a probation report, showed among other things that on March 21, 1946, he was delivered to the United States Immigration Inspector because of a violation of the immigration laws; that on October 29, 1950, he was released to United States immigration authorities; and that on January 31, 1955, because of an illegal entry, he was released to the United States immigration authorities.

At the time of the filing of the probation officer's report the immigration authorities had a case against the defendant and he was then up for deportation. The probation officer's report indicated that at the time of the arrest of the appellant he had large sums of money and some bonds in his possession. The appellant stated to the probation officer untruthfully that he had never been arrested before and indicated correctly that he was in this country illegally.

A supplemental probation officer's report was filed on June 29, 1955, which indicated that the appellant at the time of his arrest had heroin of the commercial value of about $25,000 in his possession, that he was strongly suspected of being a wholesale dealer in heroin, that he had extensive connections "below the border" and that his operations were extensive. In both probation officer's reports it was recommended that probation be denied.

On July 1, 1955, the appellant was sentenced to the state prison for the term prescribed by law, the sentence was then suspended and appellant was placed on probation for 10 years upon the conditions: "Defendant to serve one year County Jail; said jail term to be reduced to time already served if defendant is deported. If not deported, upon his release to leave the United States and to not return to this country." At the time of the sentence and imposition of judgment the following occurred:

"THE COURT: I will hear you."

(Counsel for Cortez.)

"MR. STERN: In so far as his prior arrests record, there is that one prior, with *the deportation* with the Immigration. That is the only arrest that is actually of any importance. There is a drunk charge, and a 502, and the other is referred to the present offense, which is the present narcotics charge; *and also there is a hold by the Federal government for deportation. At the present time, as soon as any disposition is made of this case, the Federal government plans to deport the man. He has already had his hearing.* It was possibly four or five months ago when he was first arrested he had the

hearing. If the Court could see fit in this particular instance—I realize there is quite a bit of narcotics involved in the case—if the Court could see fit to impose a suspended sentence on condition he is deported, and I believe he will be deported within a month after any sentence is imposed, and after the completion of any sentence, I should say, and that the Federal government would not release him on bail of any sort. They would only allow him to remain in the County Jail until he is deported, or wherever he is being held. Taking into consideration the fact he has been in custody approximately six months in this matter, I submit to the Court *I feel that deportation in this case would be proper.*

"THE COURT: As I understand it now it is the request of the defendant that proceedings be suspended in this matter pending the determination of the deportation matter, is that correct?

"MR. STERN: Yes, your Honor, and I believe that if——

"THE COURT: There is a code section which authorizes a suspension of proceedings, isn't there, Mr. McGinley?"

(Deputy District Attorney)

"MR. McGINLEY: I don't know, your Honor. I object to that type of proceeding, though. I think this is a case where the evidence clearly discloses that this defendant is probably one of the big narcotic pushers in this area, and he is not a user. He is merely in it for the profit. And I think that we should not treat this man any differently because *he has a deportation proceeding pending against him.*

"THE COURT: Except this. Of course if we send him to the penitentiary here, California has the burden of maintaining and supporting him during that period of time. And if he is deported we get rid of him.

"MR. McGINLEY: For how long? That is the question."

(Emphasis added.)

A warrant of arrest was issued on July 9, 1956, and an order revoking the probation theretofore granted was made.

The appellant was charged with a violation of the probation in the early part of 1960, it being asserted that he was deported to Mexico on April 26, 1956, and had never reported. A violation of probation was found to be true on May 27, 1960, and the order of July 1, 1955, was placed into full force and effect.

The appellant was arrested about April 22, 1960, at his home in Compton, where he was living in a common-law relation with Tillie Hernandez. One child had been born as

the issue of that relationship. The appellant stated that although he was deported by the United States Immigration Department in 1956, through the port of Brownsville, Texas, he had returned to this country at a point about one mile west of Nogales, Arizona, without immigration documents and without inspection by the immigration authorities. He also stated that he did not know the whereabouts of his wife. He seemingly was fully aware that he was in this country illegally at the time of the hearing with which we are presently concerned.

Appellant obviously was never lawfully admitted to the United States as an immigrant for permanent residence. His reentry to the United States west of Nogales constituted a crime under the circumstances (8 U.S.C. § 1325). He never applied for or received permission to reapply for admission after deportation. He failed to file an alien address report required by the federal law. The appellant confided in a friend that he was a probation violator, the police were told this, and subsequently the sheriff picked him up.

A hearing was held as to whether or not the probation previously granted should be revoked. Counsel for appellant at that time argued that the warrant of arrest of appellant which was issued shortly after appellant was deported was void, and that inasmuch as the appellant was arrested under that warrant all proceedings thereafter also were void. Appellant asserts presently that the specific condition of probation that upon his release from jail he leave this country and not return to it is void as an order of banishment and that the order revoking probation allegedly based on his violation of this condition is likewise void.

The prosecution concedes that the order of banishment is void. See *People* v. *Blakeman,* 170 Cal.App.2d 596, 597, 599 [339 P.2d 202] ; *In re Newbern,* 168 Cal.App.2d 472, 475 [335 P.2d 948] ; *In re Scarborough,* 76 Cal.App.2d 648, 649-650 [173 P.2d 825] ; *People* v. *Lopez,* 81 Cal.App. 199, 203-204 [253 P. 169].

The district attorney, at the time of the hearing, contended that the appellant had violated certain implied conditions of probation by returning to this country without benefit of clearance from the immigration authorities, the abandonment of his wife, and the living in a common-law relationship with another woman.

Probation is not a matter of right but an act of grace and clemency (*People* v. *Brown,* 172 Cal.App.2d 30, 34 [342

P.2d 410]). ▆▆▆ Necessarily a broad discretion is lodged with the trial judge in matters with reference to probation (*People* v. *Lippner,* 219 Cal. 395, 400 [26 P.2d 457]; *People* v. *Silverman.* 33 Cal.App.2d 1, 5 [92 P.2d 507]) and the determination which is necessary by the trial judge in revocation proceedings can be made solely upon the probation officer's report (*People* v. *Yarter,* 138 Cal.App.2d 803, 805-806 [292 P.2d 649]; *People* v. *McClean,* 130 Cal.App.2d 439, 444 [279 P.2d 87]).

The probation officer's reports in this case indicate that the appellant had at the time of sentencing already had a hearing before the United States Immigration Department with reference to his deportation. It is apparent that the order of the judge to the effect that the appellant be deported was of no effect and had no bearing on the deportation of appellant by the United States authorities. The appellant in fact had once been deported before the case with which we are concerned was in existence and according to the federal officials he was deportable at the time of sentence without any assistance or suggestions from the state courts. The appellant admittedly re-entered the United States illegally. Certainly the appellant was engaging in "criminal practices" and he had become "abandoned to improper associates." The appellant himself knew that he was a violator and so told a friend.

▆▆▆ Probation is granted to the end that a defendant may rehabilitate himself, make a responsible citizen out of himself and be obedient to the law. ▆▆▆ It is implicit in every order granting probation that the defendant refrain from associating with improper persons or engaging in criminal practices (*People* v. *Lippner,* 219 Cal. 395, 398-400 [26 P.2d 457]; *People* v. *Hunter,* 42 Cal.App.2d 87, 91 [108 P.2d 472]).

▆▆▆ Probation or suspension of a sentence must of course be granted in accordance with the law (*Oster* v. *Municipal Court,* 45 Cal.2d 134, 139 [287 P.2d 755]) and if a court does otherwise the suspension is void but if a sentence has been imposed the sentence remains good (*People* v. *Cravens,* 115 Cal.App.2d 201 [251 P.2d 717]).

▆▆▆ The order of banishment is not authorized by law and is void but it is severable from and does not adversely affect the valid conditions of the order as made.

▆▆▆ It has been held that where a defendant violates the law (as this appellant did so violate the law during the probationary period) he may be arrested by the probation officer or any peace officer without a warrant or other process (*In*

*re Young,* 121 Cal.App.2d 711 [10 P.2d 154]; Pen. Code, § 1203.2).

Reduced to the simplest terms this appellant asked the trial judge to impose in part a void order and the court complied with his request. The appellant thereafter violated the law and now asserts that the courts are powerless to do anything about it because the judge complied with his request in the first instance in imposing a void condition.

The defendant may not appeal from an order denying a motion in arrest of judgment. (*People* v. *Proctor,* 46 Cal.2d 481 [296 P.2d 821]; *People* v. *Tidwell,* 108 Cal.App.2d 60 [238 P.2d 21]; *People* v. *Bentson,* 132 Cal.App. 295 [22 P.2d 734]; *People* v. *Rubens,* 11 Cal.App.2d 576 [54 P.2d 98, 1107]; *People* v. *Godines,* 17 Cal.App.2d 721 [62 P.2d 787]; *People* v. *Dallas,* 42 Cal.App.2d 596 [109 P.2d 409]; *People* v. *Weiskopf,* 60 Cal.App.2d 214 [140 P.2d 201]; *People* v. *Krupa,* 64 Cal.App.2d 592 [149 P.2d 416]; *People* v. *McGee,* 31 Cal.2d 229 [187 P.2d 706]; *People* v. *Smyre,* 165 Cal.App. 2d 651 [332 P.2d 391]; *People* v. *Mills,* 148 Cal.App.2d 392 [306 P.2d 1005]; *People* v. *Costa,* 141 Cal.App.2d 795 [297 P.2d 667].)

There is no merit to appellant's contention to the effect that his motion to quash a warrant of arrest should have been granted. The attempted appeal from the order denying the motion in arrest of judgment is dismissed.

The orders of the trial judge with reference to revoking probation and placing into full force and effect the original sentence and the order refusing to quash the warrant of arrest are and each is affirmed.

Wood, P. J., and Lillie, J., concurred.

[Crim. No. 7625. Second Dist., Div. One. Feb. 5, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. VIRGINIA CARROL AMBROSE, Defendant and Appellant.

Marvin L. Klynn and Russell E. Parsons for Defendant and Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was charged with possession of heroin, and three prior felony convictions. By stipulation the matter was submitted to the court on the transcript of the preliminary hearing and the police and arrest reports in the file of the district attorney. She appeals from the judgment of conviction and sentence; the purported appeal from the latter is dismissed. (*People* v. *Gallardo,* 41 Cal.2d 57 [257 P.2d 29].)

According to the testimony of Deputy Velasquez, the following occurred. Sheriff's deputies were engaged in conducting a narcotic investigation of defendant and the area in question; Velasquez had been told by confidential informants, among them Robert Garcia and Henry Korman whom he had previously used, that defendant, her husband and another suspect were selling narcotics at their residence and making delivery to purchasers at a parking lot in a market at Avalon and Florence Avenues. On October 29, 1959, at 12:30 p. m.,

Velasquez and deputies Nesmith and Guitterez began a surveillance of the parking area of the market; around 1 p. m. Velasquez observed defendant drive into the lot and park a vehicle he recognized as one he had previously seen at her residence. He saw her walk to the front entrance of the market, motion to a woman known to the deputies as a narcotic user and begin a conversation with her; whereupon, Velasquez approached defendant, displayed his identification and told her he was a police officer. Upon seeing his badge defendant hurriedly backed up "trying to evade" him and at the same time made a motion to her mouth with her right hand in which Velasquez saw a rubber balloon containing a white powdery substance; as she did so, he struck her hand. Backing up, defendant hit a sheriff's vehicle that had been parked directly behind her; and as he struck her hand Velasquez saw the heroin leave it and fall to the asphalt beside her. During this time the woman to whom defendant had been talking disappeared. Defendant was placed under arrest and questioned concerning the heroin in the balloon; she said she knew nothing about the substance or how it got there.

In her defense, defendant told an involved story about going to the market, parking in the lot, purchasing a newspaper at a stand near the door, and seeing a woman on the other side fall back screaming and run away among the parked cars pursued by Velasquez. She testified that after seeing this she was then struck and knocked down by a station wagon and handcuffed by Velasquez, at which time she heard one of the officers say, "I've got it," and laugh. A Mrs. Harris, who claimed never to have seen defendant before October 29, testified to much the same story.

Appellant claims that the heroin was obtained as the result of an unlawful search and seizure and that her arrest was not valid having been made without reasonable cause aggravated by a violation of section 841, Penal Code.

Inasmuch as Deputy Velasquez had no warrant, for the arrest of defendant to be valid he must have had reasonable cause to believe that she had committed a felony or was committing a public offense in his presence. (Pen. Code, § 836, subds. 1, 3.) ▉ There being no formula for its determination (*Go-Bart Importing Co.* v. *United States*, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]), what constitutes "reasonable cause" depends upon the facts and circumstances of each case (*People* v. *Hollins*, 173 Cal.App.2d 88 [343 P.2d 174]; *People* v. *Wickliff*, 144 Cal.App.2d 207 [300 P.2d 749]; *People* v.

*Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577])—the situation presented or apparent to the officers at the time they were required to act. (*People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73] ; *People* v. *Carella,* 191 Cal.App.2d 115 [12 Cal.Rptr. 446] ; *People* v. *Sanchez,* 189 Cal.App.2d 720 [11 Cal.Rptr. 407] ; *People* v. *Baca,* 184 Cal.App.2d 693 [7 Cal.Rptr. 864] ; *People* v. *Evans,* 175 Cal.App.2d 274 [345 P.2d 947] ; *People* v. *Murphy,* 173 Cal.App.2d 367 [343 P.2d 273] ; *People* v. *Hollins,* 173 Cal.App.2d 88 [343 P.2d 174] ; *People* v. *Silvestri,* 150 Cal.App.2d 114 [309 P.2d 871].)

The weight to be accorded the information possessed by the officers at the time they made the arrest is for the trial court and it, not the officers, makes the determination whether the information upon which their belief was based, constitutes "reasonable cause." (*People* v. *Fisher,* 184 Cal. App.2d 308 [7 Cal.Rptr. 461] ; *People* v. *Boyles,* 45 Cal.2d 652 [290 P.2d 535] ; *People* v. *Carella,* 191 Cal.App.2d 115 [12 Cal.Rptr. 446] ; *People* v. *Taylor,* 176 Cal.App.2d 46 [1 Cal.Rptr. 86] ; *People* v. *Arter,* 169 Cal.App.2d 439 [337 P.2d 534] ; *Lorenzen* v. *Superior Court,* 150 Cal.App.2d 506 [310 P.2d 180].) "Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577] ; *People* v. *Fischer,* 49 Cal.2d 442 [317 P.2d 967] ; *Bompensiero* v. *Superior Court,* 44 Cal.2d 178 [281 P.2d 250] ; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73].)

Having previously been informed of defendant's narcotic activities at her residence and the market parking lot, and having observed defendant motion over a known narcotic user and engage in conversation with her at the market, the deputy quite reasonably suspected she was then engaged in some unlawful conduct, and it was entirely proper for him to approach her for the purpose of questioning her (*People* v. *Burke,* 47 Cal.2d 45 [301 P.2d 241] ; *People* v. *Michael,* 45 Cal.2d 751 [290 P.2d 852] ; *People* v. *Sanchez,* 189 Cal.App. 2d 720 [11 Cal.Rptr. 407] ; *People* v. *Davis,* 188 Cal.App.2d 718 [10 Cal.Rptr. 610] ; *People* v. *Campos,* 184 Cal.App.2d 489 [7 Cal.Rptr. 513] ; *People* v. *Neal,* 181 Cal.App.2d 304 [5 Cal.Rptr. 241] ; *People* v. *Zavaleta,* 182 Cal.App.2d 422 [6 Cal.Rptr. 166] ; *People* v. *Jaurequi,* 142 Cal.App.2d 555 [298 P.2d 896] ; *People* v. *Elliott,* 186 Cal.App.2d 178 [8 Cal.

Rptr. 795]; *People* v. *Tisby,* 180 Cal.App.2d 574 [5 Cal.Rptr. 614]); and the fact that he did so does not mean that she was then under arrest. (*People* v. *Michael, supra; People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855]; *People* v. *Sanchez,* 189 Cal.App.2d 720 [11 Cal.Rptr. 407]; *People* v. *King,* 175 Cal. App.2d 386 [346 P.2d 235]; *People* v. *Hood,* 149 Cal.App.2d 836 [309 P.2d 135].) Moreover it is apparent from the record, and the trial court must have found, that at the time the deputy walked up to defendant and identified himself he neither had any intention of arresting her nor did he do so. (*People* v. *Robles,* 183 Cal.App.2d 212 [6 Cal.Rptr. 748]; *People* v. *Elliott,* 186 Cal.App.2d 178 [8 Cal.Rptr. 795].) He started to talk to her by first telling her he was a police officer and producing his badge, but her conduct then made it impossible for him to continue and, viewed in the light of his previous information of her narcotic activities, his observations of her up to that time, and its furtive nature, her conduct provided the deputy with sufficient basis to support a reasonable belief that defendant then had narcotics in her possession and was in the act of committing a felony. (*People* v. *Robles,* 183 Cal.App.2d 212 [6 Cal.Rptr. 748]; *People* v. *Garcia,* 171 Cal.App.2d 757 [341 P.2d 351]; *People* v. *Tisby,* 180 Cal.App.2d 574 [5 Cal.Rptr. 614].) Upon seeing his badge she hurriedly backed up in an attempt "to get away from" Velasquez, and at the same time put her hand, in which he saw a balloon containing a white powdery substance, to her mouth. As an experienced member of the narcotics detail the deputy knew the white powdery substance to resemble, and suspected it to be, heroin, the rubber balloon container to be one customarily used among those engaged in narcotic activities for carrying and storing heroin, and the placing of the narcotic in the mouth or swallowing the same to be often resorted to as a means of disposing of it. When the deputy saw the furtive action and suspicious conduct of defendant's move backward and her attempt to secrete the balloon in her mouth, he frustrated her act by knocking the object from her hand. It was only then, after he saw the heroin fall to the ground, he made the arrest.

While appellant complains there was an unreasonable search and seizure, it is clear from the evidence that no search took place prior to defendant's arrest. ■ When defendant attempted to back away from the deputy, Velasquez saw the heroin in her right hand and picked it up when it fell to the ground. "To observe that which is open and patent is

not a search." (*People* v. *Jaurequi*, 142 Cal.App.2d 555 [298 P.2d 896]; *People* v. *Roberts*, 182 Cal.App.2d 431 [6 Cal. Rptr. 161]; *People* v. *Quinn*, 194 Cal.App.2d 172 [14 Cal. Rptr. 814]; *People* v. *Russell*, 196 Cal.App.2d 58 [16 Cal. Rptr. 228]; *People* v. *Linden*, 185 Cal.App.2d 752 [8 Cal. Rptr. 640].) That the deputy knocked the narcotic out of defendant's hand is of little significance in the matter of search, for he saw it in her hand before he struck it, indeed it is for that reason he did so; moreover, on the issue of seizure, this was the extent of any force used against defendant, her contact with the automobile having come about through her own efforts to get away from the deputy. The amount of force used to release the narcotic from defendant's hand was entirely reasonable, its purpose to prevent her from disposing of the evidence by secreting it in her mouth or swallowing it. (*People* v. *Smith*, 50 Cal.2d 149 [323 P.2d 435]; *People* v. *Dixon*, 46 Cal.2d 456 [296 P.2d 557]; *People* v. *Sanchez*, 189 Cal.App.2d 720 [11 Cal.Rptr. 407].)

Appellant says that the "search" and seizure took place before her arrest and thus were improper. However for a search and seizure to be valid it is not always necessary for the arrest to precede the same; if they are part of the same transaction they may occur prior thereto. (*People* v. *Vice*, 147 Cal.App.2d 269 [305 P.2d 270]; *People* v. *Baca*, 184 Cal. 2d 693 [7 Cal.Rptr. 864]; *People* v. *Simon*, 45 Cal.2d 645 [290 P.2d 531].) "The fact that the search[es] preceded the arrest is of no consequence. (*People* v. *Luna*, 155 Cal.App.2d 493, 494-495 [318 P.2d 116].)" (*People* v. *Williams*, 189 Cal. App.2d 29, 38 [11 Cal.Rptr. 43].) ". . . it is immaterial that the seizure of the paraphernalia used in the commission of the crime may have preceded rather than followed the arrest . . ." (*People* v. *Martin*, 45 Cal.2d 755, 762 [290 P.2d 855].)

Contrary to appellant's claim that there is no evidence concerning the identity of the informants, and none that they were reliable or if they were informant-participants, the record clearly shows that the two informers were Robert Garcia and Henry Korman, that Deputy Velasquez had received information from these men in the past and that no informant participated in any of the events of October 29. In any event, the informants' reliability is of little significance here for the evidence reveals that in making the arrest the deputies relied almost exclusively on their personal observations of defendant

and her conduct immediately prior thereto. (*People* v. *Lovio*, 189 Cal.App.2d 427 [11 Cal.Rptr. 162].)

▇ Appellant's argument that the deputies failed to comply with section 841, Penal Code, in that prior to arresting her they did not inform her of their intention to do so and the cause of the arrest, is without merit, for at the time of her arrest the deputies had reasonable cause to believe that she was, and she was ''actually engaged in the commission of . . . an offense. . . .'' (§ 841.)

Presented to the trier of fact were two versions of what occurred on October 29; the trial judge, after hearing and observing the witnesses and determining their credibility, weighing the evidence and resolving the factual conflicts, accepted the deputies' testimony as true rejecting that of defendant and her witness. It is apparent that he did not believe defendant's story or that her witness, Mrs. Harris, who claimed not to have known her before October 29, fell into the category of a disinterested bystander. ▇ Since conflicts in stories told by various witnesses are to be resolved by the trier of fact (*People* v. *Nunley*, 194 Cal.App.2d 233 [14 Cal.Rptr. 874]; *People* v. *Casado*, 181 Cal.App.2d 4 [4 Cal. Rptr. 851]) we find no merit in appellant's argument predicated on the testimony of Mrs. Harris.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

[Crim. No. 7704. Second Dist., Div. One. Feb. 5, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD RODRIGUEZ GONZALES, Defendant and Appellant.

Donald R. Mizener for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and A. Douglas MacRae, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of a violation of section 11530, Health and Safety Code (possession of narcotics).

In an information filed in Los Angeles County on December 23, 1960, the appellant, with Ralph Carillo Acuna and James Raymond Porter, was charged with the possession of marijuana on or about December 6, 1960. Porter made a motion under section 995 of the Penal Code, which was granted. Like motions were made by the appellant and Acuna. The motions were denied. Appellant pleaded not guilty and trial by jury was waived. Appellant was found guilty as charged and sentence was imposed.

A résumé of some of the facts is as follows: At or about 10:45 p. m. on December 6, 1960, a Monterey Park police officer and his partner saw a 1930 model Ford automobile travelling at a high rate of speed in a 35 mile per hour zone. The Ford car seemed to weave and its course was erratic. The officers followed the Ford onto the San Bernardino Freeway, where they saw the driver of the Ford car make unsafe lane changes. They thereupon, by evidencing that they were police officers, caused the Ford to come to a stop. Before the officers arrived at the stopped Ford car they had observed that the driver thereof disappeared from sight for a few seconds. The driver, Acuna, was asked what he had attempted to conceal when he was out of sight and he did not answer. One of the officers, upon looking into the Ford car, saw a brown paper sack extending from under the front seat and asked what was in the sack. There was no reply at first and then Acuna said in effect for the officer to look for himself and stated that it was "hot." Porter was seated to the right of the driver Acuna and appellant was seated to the right of Porter or, in other words, appellant was next to the front door on the right-hand side of the car. The officer, upon looking at the contents of the paper bag, arrested the three men for the possession of marijuana.

At the police station the Ford car was further searched and two marijuana cigarettes were found in the fold of a blanket which covered the front seat.

Among other statements made to the police, Acuna stated that appellant had come to his house and had told him of an easy way to make some money without working for it; that they were both hard pressed for ready cash and they had gone to Porter's home and then to Los Angeles where they had purchased some marijuana and headed back to Pomona, where

they intended to roll the raw marijuana into cigarettes and sell them. Acuna further stated that he gave the money to appellant to make the purchase of the marijuana in question.

One of the officers had a talk with appellant on December 7th and appellant's version of what occurred at the times in question was very different from Acuna's statements. Appellant was asked if he would give a statement to a secretary in accordance with his remarks and he answered in the affirmative. A secretary was called in and appellant dictated a statement to the secretary. When the statement so dictated was written up and brought back to him in form for signature appellant refused to sign it. Shortly thereafter appellant, Acuna and Porter were brought together. Porter refused to make any statement, and was taken back to his cell. The officer then talked with appellant and Acuna. At the trial the question was asked, ". . . [W]hat was the conversation from there on at the time?" The officer answered, "At this time Mr. Acuna stated that he did not want to take the rap alone, that Mr. Gonzales and Mr. Porter were in with him on this, and that he wanted to come clean, but he wanted them present. He stated to Mr. Gonzales, 'Lets tell them the truth, I don't want to take this rap alone,' to which Mr. Gonzales stated, 'All right, if we can get Porter back in here,' or words to that effect."

It was brought out in the examination of the appellant that he previously had been convicted in the federal court of a narcotics offense, namely, a felony (possession or sale of marijuana), although that offense was not alleged in the information.

Appellant now asserts that there was no showing that he had the possession of the marijuana in question, and that he had no knowledge of the marijuana found in the automobile.

This court does not have the power to disturb the findings of the trier of fact unless it can be said that as a matter of law there is no evidence to support the trial court. *People* v. *Redrick,* 55 Cal.2d 282, 284, 290 [10 Cal.Rptr. 823, 359 P.2d 255] ; *People* v. *Tedesco,* 1 Cal.2d 211, 219 [34 P.2d 467].

The presence of appellant in the front seat of the automobile where the narcotics were found is a circumstance which tends to support a finding that he was a principal. *People* v. *Le Grant,* 76 Cal.App.2d 148, 153 [172 P.2d 554].

Conduct of the parties, admissions or contradictory statements and explanations are frequently sufficient to show

knowledgeable possession of a narcotic. *People* v. *Foster*, 115 Cal.App.2d 866, 868 [253 P.2d 50].

The trial judge heard and saw the witnesses. From what was said and what he saw the judge came to the conclusion that the appellant possessed the marijuana and had guilty knowledge thereof. When Acuna said to the appellant under the circumstances and the setting which heretofore have been mentioned, "Lets tell them the truth, I don't want to take the rap alone," and appellant replied, "All right, if we can get Porter back in here," the trial judge did not believe that the reply of appellant was that of an innocent man under such circumstances. Certainly the statement of Acuna and the purport thereof was that Acuna was not the only guilty person in the transaction and that appellant was definitely involved therein, otherwise why would Acuna even talk to appellant about the matter. In effect Acuna said to appellant, Let's tell the truth about who were the owners and the possessors of the marijuana, so that I (Acuna) will not have to be the only one who suffers from a crime *we* have committed. To which appellant replied, in effect, All right, if we can get the third member of our group to tell the truth also and suffer the consequences with us.

There was an implied acknowledgment of appellant's guilty participation in the procuring and possession of the marijuana. His agreement that the truth might be revealed conditioned upon Porter's being brought into the room does not necessarily cancel out his own implied admission.

Admissions against interest are competent proof under the circumstances. *People* v. *Rumley*, 100 Cal.App.2d 6, 10 [222 P.2d 913]; *People* v. *Lindsey*, 90 Cal.App.2d 558, 565 [203 P.2d 572]; and *People* v. *Mason*, 65 Cal.App.2d 5, 10 [149 P.2d 742].

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

[Crim. No. 7725. Second Dist., Div. Two. Feb. 5, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FRED W. PACK, Defendant and Appellant.

Edward L. Lacy for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Herbert Davis, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendant was convicted by a jury of violating section 23101 of the Vehicle Code in that he drove an automobile while under the influence of intoxicating liquor, proximately causing bodily injury thereby. His motion for a new trial was denied. Probation was granted for a three-year period, one of the conditions being the payment of a fine of $250. Defendant has appealed from the judgment (order granting probation[1]) and from the order denying his motion for a new trial.

On the evening of August 1, 1960, Ronald L. Hudelson was involved in an automobile accident while driving in a westerly direction on Highway 118, a road connecting Simi and San Fernando Valleys by way of Santa Susana Pass. His cousin, Charlette Olinger, was in the car with him at the time. He remembers driving his Oldsmobile at a speed of approximately 30 to 35 miles per hour on the right side of the highway when all of a sudden a Lincoln came at him on the wrong side of the road and a collision ensued. The collision occurred at a point in Los Angeles County about 500 feet east of the Ventura-Los Angeles County line. It took place on the outside of a curve in the highway. Hudelson blacked out. He and his cousin were hospitalized at Woodland Park Community Hospital. He remained there for five days.

[1]See Penal Code section 1237, subdivision 1.

Defendant was traveling eastbound with two male companions in his Lincoln car. He was rendered unconscious and did not regain consciousness until the following morning in the Woodland Park Community Hospital. The accident apparently happened about 9:25 p. m.

Officer Carlson of the California Highway Patrol went to the scene of the accident in response to a call at approximately 10 o'clock that evening. He observed that the accident was between an Oldsmobile and a Lincoln and that both cars were severely damaged. The accident occurred on a two-lane highway, each lane being approximately 15 feet wide. He noticed that the major portion of the damage was to the left front of the Lincoln and the left front of the Oldsmobile. There were no people in either car when the officer arrived. He was unable to obtain the names of any witnesses who saw the accident. In the course of his investigation Officer Carlson found a partially filled quart bottle of beer on the front floor of the Lincoln. He was given some photographs of the accident, taken by a photographer, depicting the cars in a state of collision on the outside of the curve. The photographer arrived shortly before 10 p. m. He took the pictures at approximately 10:10. They truly and accurately depicted the scene.

Officer John R. Ellis, also of the California Highway Patrol, was at the scene of the accident with Officer Carlson. Officer Ellis had had extensive experience in investigating accidents. He observed debris lying under the fenders of the Lincoln. He concluded that this was the point where the Lincoln came to rest. He also observed a gouge in the pavement. He established the point of impact of the "collision as approximately six feet from the edge—south from the north edge of the roadway . . ." approximately where the gouge marks were. There is no evidence that the cars had been moved from the other side of the road.

Officer Ellis went to the Woodland Park Community Hospital to see defendant. He found him in a room with three other patients. In his opinion defendant was unconscious. Gerald Sprague, who was a medical student, was employed as a laboratory technician at the hospital. He was instructed by a hospital physician to take a blood sample from defendant for medical reasons. The physician went with him into the room to be sure he had the right patient. Later that evening the witness took another blood sample from the defendant for the Highway Patrol. Officer Ellis was present when Sprague withdrew blood from the defendant's left arm, using a steril-

izing agent and syringe. The blood was put into a vial supplied by Officer Ellis, and the vial was then sealed. Sprague placed his initials on the container. Ellis locked the vial in a refrigerated unit in his office in West Los Angeles. Officer Ellis identified People's Exhibit 5 by his writing and ID number as being the vial in which he put the blood taken from defendant and the manila envelope in which he put the vial which he locked in the refrigerated unit in his office. Sprague's initials were also on the vial. (Exhibit No. 5.)

George Stevens, traffic officer of the Highway Patrol, took the manila envelope (People's Exhibit No. 5) from the locked refrigerated compartment in the office in West Los Angeles and brought it to the sheriff's crime laboratory on August 2, giving it to the deputy on duty at the time.

Harry E. McKeehan, an expert forensic chemist with the Los Angeles County Sheriff's Crime Laboratory, removed the manila envelope (People's Exhibit No. 5) from his laboratory later that day. It contained a sealed vial in which was some fluid resembling blood. Chemical analysis of this fluid was made by the witness for the purpose of determining how much, if any, alcohol was present therein. His analysis disclosed that there were .16 grams of alcohol per 100 cubic centimeters of blood, or .16 per cent by weight. The system used is reliable to 1/10th of a milligram. The witness identified the vial marked People's Exhibit 5 as being the vial containing the fluid he analyzed.

Tom Wieland, an expert forensic chemist, testified that on the basis of numerous experiments that he had conducted a person who had a level of .15 per cent by weight would be under the influence of alcohol. He further stated that the rate at which the blood alcohol level goes down varies from person to person and that in his experience the lowest rate is .01 per cent of alcohol by weight per hour; that the average rate is about .02 per cent.

Defendant testified that he had driven the Santa Susana road many times; that it is a straight road from the Los Angeles County Line for about 500 feet and then it veers sharply to the left where there is a blind left curve. There is a down grade slope in the road going east which you cannot see as you approach it. However, once you get around that curve you can see for 1,000 feet or more.

Defendant further testified that on August 1, 1960, he was driving in an easterly direction on this road with two other men in his car. He was traveling on the right hand side of the

road at about 30 miles an hour when he started into the curve; he did not know what happened; he saw a flash of light from another automobile and from then on he remembered nothing. The accident occurred on his side of the road.

Defendant woke up the following morning in the Woodland Park Community Hospital. He did not recall any events between the accident and the time he woke up that morning. No one made a request that he give a sample of blood. He did not observe any marks on his arm the next morning. He was not placed under arrest and never saw Officers Carlson or Ellis, or Mr. Sprague.

 Defendant's first contention is that the court erred in admitting in evidence People's Exhibit 7, which is a freehand drawing made by Officer Carlson while he was on the witness stand to illustrate the scene of the accident. His contention is that this drawing depicts the curve as turning in the opposite direction from that in which it does in fact turn. Defendant concedes that "the trial court specified that People's Exhibit 7 was admitted only for purposes of illustration." To admit such illustrative drawing is properly within the court's discretion. (*Silvey* v. *Harm*, 120 Cal.App. 561, 571 [8 P.2d 570]; 18 Cal.Jur.2d, Evidence, § 224.) It is nevertheless contended that it was prejudicial because it materially confused the truth and in effect created a false image in the minds of the jurors. We fail to find any merit in this argument.

Both sides agree upon three things: (1) that the defendant was driving easterly; (2) that Hudelson was traveling westerly; and (3) that the collision occurred on the outside of the curve. People's Exhibits 2 and 3, which are photographs of the cars shortly after the accident and which were taken by the photographer; the diagram on the traffic accident report; Officer Carlson's testimony illustrated by People's Exhibit 7;[2] and Officer Ellis' testimony that the point of impact was "approximately six feet from the edge—south from the north edge of the highway . . .," are all consistent as to the manner in which the accident happened and demonstrate that it occurred on the north side of the highway, thus substantiating Hudelson's testimony that his car was on its proper side of

[2]It is interesting to note that when People's Exhibit 7 was offered in evidence counsel for defendant made no suggestion that it did not fairly portray the scene of the accident. His only comment was that the jury should be admonished that it was not drawn to scale. The court did so admonish the jury.

the highway and that defendant's Lincoln had passed over the center line onto the wrong side.

Defendant's exhibits are photographs which were taken after the cars were removed from the highway. He claims these photographs represent the curve in question. He testified as to the points from which these photographs were taken and the direction in which the photographer was facing. If the defendant's testimony as to these photographs were accepted as being correct, it would follow that the accident occurred on the south side of the highway rather than on the north side, and that his automobile was therefore on its proper side of the highway. The exhibits and the testimony relative to the foundation for them merely presented a conflict in the evidence which the jury was called upon to resolve. In making this resolution the jury was not required to give credence to the defendant's testimony in these respects. They were entitled to take into account his interest in the outcome of this litigation. (*Huth* v. *Katz,* 30 Cal.2d 605, 609 [184 P.2d 521]; *Kraut* v. *Cornell,* 175 Cal.App.2d 528, 532 [346 P.2d 438].) The jury's resolution of this question against the defendant, being based on substantial evidence, is controlling on appeal.

Defendant contends the court erred in admitting in evidence plaintiff's Exhibit 5. ▮ The first aspect of this contention is that there is no evidence to show how the vial containing a sample of defendant's blood got into the refrigerator of the sheriff's crime laboratory. Officer Ellis testified he took the sealed vial from the hospital and put it into a manila envelope which he locked in the refrigerated unit in his West Los Angeles office; Officer Stevens on August 2d delivered this package to the deputy in charge at the crime laboratory; McKeehan, the department's forensic chemist, removed the manila envelope from the crime laboratory and tested the fluid in the sealed vial. Bearing in mind the presumption that "official duty has been regularly performed" (Code Civ. Proc., § 1963, subd. 15) it is a reasonable inference that the deputy on duty at the crime laboratory to whom Officer Stevens delivered the manila envelope either placed it in the refrigerator or that it was placed there pursuant to his direction. This presumption is itself evidence. (*Raymond* v. *Independent Growers, Inc.,* 133 Cal.App.2d 154, 162 [284 P.2d 57].) No fact has been suggested to rebut this evidence. It is therefore clear that the chain of possession of People's Exhibit 5 has been sufficiently established.

 The second aspect of defendant's contention is that People's Exhibit 5 was obtained and admitted in violation of his constitutional rights. Pertinent to defendant's position is the statement of the court in *People* v. *Duroncelay,* 48 Cal. 2d 766, 770-771 [312 P.2d 690] : "It is settled by our decision in *People* v. *Haeussler,* 41 Cal.2d 252, 257 [260 P.2d 8], that the admission of the evidence did not violate defendant's privilege against self-incrimination because the privilege relates only to testimonial compulsion and not to real evidence. We also held in the *Haeussler* case that the taking of the defendant's blood for an alcohol test in a medically approved manner did not constitute brutality or shock the conscience and that, therefore, the defendant had not been denied due process of law under the rule applied in *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]. This holding is in accord with the recent decision of the United States Supreme Court in *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448], where blood for an alcohol test was taken by a doctor while the defendant was unconscious. The court pointed out that blood tests had become routine in everyday life and concluded that 'a blood test taken by a skilled technician is not such "conduct that shocks the conscience," *Rochin, supra* (342 U.S. at 172), nor such a method of obtaining evidence that it offends a "sense of justice," *Brown* v. *Mississippi,* 297 U.S. 278, 285, 286 [56 S.Ct. 461, 80 L.Ed. 682].' There is no claim in the present case that the blood sample was not withdrawn in a medically approved manner. The blood was extracted by a registered nurse, and her testimony shows that she sterilized defendant's arm and used sterilized instruments.

"The question remains as to whether the taking of defendant's blood constituted an unreasonable search and seizure in violation of his constitutional rights." The court went on to answer this question in the negative. At page 772 it was stated: "The incidence of death and serious injury on the highways has undeniably assumed tragic dimensions and has been due in a significant degree to the effects of alcohol upon drivers. (See National Safety Council Accident Facts—1955, pp. 43-71.) So long as the measures adopted do not amount to a substantial invasion of individual rights, society must not be prevented from seeking to combat this hazard to the safety of the public. The extraction of blood for testing purposes is, of course, an experience which, every day, many undergo without hardship or ill effects. When this fact, to-

gether with the scientific reliability of blood alcohol tests in establishing guilt or innocence, is considered in the light of the imperative public interest involved, the taking of a sample for such a test without consent cannot be regarded as an unreasonable search and seizure where, as here, the extraction is made in a medically approved manner and is incident to the lawful arrest of one who is reasonably believed to have violated section 501 [now 23101] of the Vehicle Code.''

Defendant attempts to distinguish this case by reference to the fact that the blood was taken ''incident to a lawful arrest'' (although the arrest followed the taking of the sample), while here there was no arrest at all. The distinction is not sound. ▋ Our courts have repeatedly stated that: ''A search or seizure may be justified even though it is in no way related to an arrest.'' (*People* v. *Ball*, 162 Cal.App.2d 465, 467 [328 P.2d 276] ; *People* v. *Murphy*, 173 Cal.App.2d 367, 379 [343 P.2d 273] ; *People* v. *Shafer*, 183 Cal.App.2d 127, 130 [6 Cal. Rptr. 594].) ▋ ''The real criterion as to the reasonableness of a search is whether or not . . . under the facts, the police officer has reasonable grounds to believe that defendant may have committed a felony.'' (*People* v. *Soto*, 144 Cal.App. 2d 294, 298 [301 P.2d 45] ; *People* v. *Anders*, 167 Cal.App.2d 65, 67 [333 P.2d 854] ; *People* v. *Brajevich*, 174 Cal.App.2d 438, 444 [344 P.2d 815].)

▋ Here Officers Carlson and Ellis arrived at the scene of a collision between a Lincoln and an Oldsmobile on the evening of August 1, 1960. The Lincoln was on the wrong side of the highway; there were no skid marks. The officers found a partially filled quart bottle of beer on the front floor of the Lincoln. They checked with the Ventura police and learned that persons had been injured in the accident and taken to the Woodland Park Community Hospital. Investigation revealed that the Lincoln was registered in the name of defendant. Officer Ellis had previous experience in investigating automobile accidents. The position of the two cars indicated that the Lincoln was traveling east and the Oldsmobile in a westerly direction. He found marks on the highway and debris indicating the point of impact of the two cars. From this factual picture the officers had reasonable grounds to believe that the driver of the Lincoln went to the wrong side of the highway thereby causing the collision, and that the driver was under the influence of alcohol at the time. Therefore there was probable cause to believe that a felony had been committed. Hence the obtaining of a blood sample from

defendant was not an unlawful search. Therefore the sample (Exhibit 5) together with its analysis was properly admitted in evidence.

It was important to get the sample as soon as possible in order that the analysis might the more accurately reflect the alcoholic content since such content became lower with the passage of time. It should also be pointed out that such tests are generally regarded as highly reliable and of substantial assistance in determining the issue of intoxication, and that a test of this kind may serve to exonerate as well as to convict.

Defendant also argues that the court should have (1) instructed the jury to acquit him and (2) granted him a new trial. These arguments are predicated on the hypothesis that neither Exhibit 5 nor Exhibit 7 was admissible in evidence. In that event, he argues, there would have been no evidence to support the conviction. We have concluded, however, that defendant's position with respect to each of these matters is not well taken. In this state of the record we need not again review the evidence to pass upon the court's ruling. Suffice it to say that both rulings appear to be entirely correct.

Affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied March 2, 1962, and appellant's petition for a hearing by the Supreme Court was denied April 3, 1962. Schauer, J., and Peters, J., were of the opinion that the petition should be granted.

division 1, in that on or about May 12, 1960, she engaged in bookmaking and in count two with a violation of Penal Code section 337a, subdivision 2, in that she kept and occupied an apartment for the purpose of recording and registering bets on horse racing.